THE UNITED STATES, APPELLANTS, *v.* ARCHIBALD A. RITCHIE.[*]

By an act of congress passed on the 31 of March, 1851, (9 Stats. at Large, 631,) provision was made for the appointment of a board of commissioners to settle private land claims in California, and for the transfer of a case decided by them to the district court of the United States for California, by way of appeal.

This law was constitutional. The board of commissioners was not a court, under the constitution, invested with judicial powers; but the commencement of the suit in the district court, when transferred there, must be regarded as an original proceeding. The district court could hear additional evidence to that which was before the board of commissioners.

The 9th section of the act directed that the United States or the claimant might file a petition, praying an appeal to the district court, and other sections pointed out the mode of proceeding. But this was all changed by an act passed on the 31st of August, 1852, (10 Stats. at Large, 99,) which directed that the filing of a transcript with the clerk of the district court should, *ipso facto,* operate as an appeal.

This amounts, also, to a notice to the opposite party.

The title of Francisco Solano, an Indian, to a tract of land in California, particularly set forth.

Although Solano was an Indian, yet he was competent, according to the laws of Mexico at the time of the grant, to take and hold real property.

The plan of Iguala, adopted by the revolutionary government of Mexico, in 1821, and all the successive public documents and decrees of that country, recognized an equality amongst all the inhabitants, whether Europeans, Africans, or Indians; and the decree of 1824, providing for colonization, recognized the citizenship of the Indians, and their right to hold land.

In 1833 and 1834, the government of Mexico passed laws for secularizing the missions, under which the public authorities granted the lands belonging to them in the same manner as other public lands.

In respect to those lands called Pueblo lands, no opinion is expressed.

THIS was an appeal from the district court of the United States for the northern district of California.

The act of congress respecting the claimants to land in California, and the title of Solano, under whom Ritchie claimed, are so particularly set forth in the opinion of the court, that the reporter has nothing to add upon those topics.

---

[*] Mr. Justice DANIEL did not sit in this cause.

It was argued in this court by *Mr. Cushing*, (attorney-general,) for the United States, and by *Mr. Bibb*, for the appellee.

The brief of *Mr. Cushing* became expanded into a printed argument of eighty-eight pages, of which the following is a mere outline : —

The act of congress passed on the 3d of March, 1851, (9 Stats. at Large, 631,) contains a clause which is declaratory of the general principles of law, by which the decisions of land claims in California are to be governed.  It is in these words:—

" The commissioners herein provided for, and the district and supreme courts, in deciding on the validity of any claim brought before them under the provisions of this act, shall be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the supreme court of the United States, so far as they are applicable."

*Mr. Cushing* analyzed these five sources of authority separately, with a view to settle and ascertain the principles of law which bore upon the case ; and, in the course of his argument, discussed, at great length, the question how the laws, usages, and customs of a foreign government were to be proved.  Proceeding to this particular case, he contended that Mariano Guadaloupe Vallejo, under whom Ritchie claims, had no title to convey, the pretended title in him being, for various reasons, null and void in law and equity.

I. Of the conveyance from Solano to Guadaloupe Vallejo.

§ 1. The claimant assumes that, by reason of the 12th and 13th articles of the plan of Iguala, Indians in Mexico may take, hold, and sell lands.

To which the reply is : —

1. They might do this, not only since, but before the plan of Iguala, beyond all doubt, as will be shown hereafter.

2. The plan of Iguala neither increased nor diminished the power of Indians, in this respect.

3. The true question is not, whether an Indian could, in California, hold and sell land, but under what circumstances and conditions.

4. Thus, any free citizen of the United States can take, hold, and sell lands ; but the law imposes forms of conveyance, without which there can be no valid sale ; and it also prescribes certain safeguards of conveyances by whole classes of citizens, such as married women, minors, and others, to prevent their being defrauded.

In the discussion of these points, he discarded entirely the

testimony of the witnesses in California, and contended that they must be decided by the Recopilacion de Indias, which was the law of the Mexican Republic, except where any of its provisions may have been repealed, either expressly, or by necessary implication, since the separation from Spain. This code, Lib. 6, Tit. 1, l. 37, Law 27, 1572, forbade Indians from selling their land, unless with permission of the court, and in pursuance of a prescribed form.

The provisions of this law, he contended, had never been repealed. The plan of Iguala and the treaties of Cordova did not repeal them. This plan and these treaties, together with the other Mexican authorities, were then particularly examined. The special legislation of the several Mexican States, on the subject of Indians, afforded conclusive evidence that the plan of Iguala did not repeal this law, (27,) or any other law of the Recopilacion de Indias, for the protection of the Indians. Our own laws for their protection, by forbidding conveyances, are analogous to this Spanish law.

As to the confirmation of Solano's title by the departmental assembly in 1845, *Mr. Cushing* contended that such confirmation did not enure to the benefit of Vallejo, the grantee, for these reasons: —

1. The purchase of Solano was not authorized by law.

2. Solano had no authority to make a valid covenant in relation to the land, or title thereto.

3. There was not, in fact, any covenant for further assurance in this instrument which could enure to the benefit of Vallejo.

Passing to another branch of this case, *Mr. Cushing* contended that the alleged grant to Solano, and conveyance by him to Vallejo, were fraudulent and void as against the Mexican government; that Vallejo was commandant of Sonoma, and Solano was his bailiff or overseer, and that Solano's name was used merely to cover the fraud. He further contended, that the missions were not the subject of the colonization law. The following is a summary of his points: —

1. The alleged sale from the Indian, Solano, was not made in the presence of a justice, and by public vendue; and was, therefore, null and void, even supposing Solano to have had a good title from the Mexican government.

2. This defect is not cured by the action of the departmental assembly, which does not relate back, nor enure for the benefit of Vallejo.

3. The case rests mainly on the testimony of Vallejo, who, having conveyed to Ritchie, with covenants of seisin and warranty, was incompetent, as a witness, to prove the title.

4. No title passed from the government to Solano, the whole

transaction being a fraud, of which Solano was the instrument, for the benefit of Vallejo.

5. The land, being mission land, was not colonizable; and, therefore, the pretended grant to Solano was null and void.

6. Being mission land, if (which is denied) Solano acquired any interest therein, he could not lawfully convey it to Vallejo by any form of conveyance whatever; and on his possession ceasing, the land reverted to the public domain.

7. The pretended title of Vallejo, through Solano, was only a fraudulent device to cover the plunder, by him, of a part of the mission lands of San Francisco Solano.

8. The land is not shown to be at the necessary distance from the frontier to make it subject to colonization.

9. Of course, Vallejo, having no title, could convey none to Ritchie, and the land appertains to the public domain of the United States.

*Mr. Bibb's* first two points related to the nature of the conditions upon which the estate was granted — a matter that will be more especially noticed in the next case, of the United States *v.* Fremont. His third point was: The United States have not prosecuted a review of the decision of the commissioners in the manner and form required by the 9th section of the act of March 3, 1851, to ascertain and settle the private land claims in the State of California, (9 Stats. at Large, 632, ch. 41,) and therefore have no grounds, no standing, no foundation whereon to pray this court to review and reverse the decision of the commissioners.

The 9th and 10th sections of this act, he contended, were not repealed by the 12th sect. of the act of 1852, (Stats. at Large, 99, ch. 108.)

IV. The time when the attorney-general received a transcript of the proceedings and decision of the commissioners does not appear in the record, and it does not appear to the court that the notice was filed with the clerk of the district court within the period of time prescribed by the 12th section of said act of 1852, that the appeal would be prosecuted by the United States; therefore, the appeal ought to be regarded as dismissed.

The final decree of the board of commissioners was pronounced and recorded January 3, 1853; the notice by the attorney-general, that appeal would be prosecuted, was filed with the clerk September 20, 1853; seven months and sixteen days had intervened; so the filing of the notice with the clerk might have been after the lapse of six months from the time the attorney-general had received a transcript of the proceedings and decision of the commissioners.

As the period of limitation began to run and to be accounted

from the time of a fact known only to the attorney-general, who gave the notice, the time that he received the transcript ought to have been made to appear on the record of the district court; which fact, if it had been alleged by the plaintiff, would have been traversable by the respondent. But the total disregard by the plaintiff of the provisions of the 9th section of the act of 1851, deprived the defendant, Ritchie, of the opportunity to rely upon the statute of limitations in the district court.

V. The title under which the appellee holds, was complete and perfect—a legal title, under a grant by the executive branch of the Mexican government, approved by the legislative branch, and consummated by the judicial branch, by juridical possession delivered to the grantee, under which the land was inhabited, improved, cultivated, and enjoyed by the owner in fee, long before and at the treaty of Guadaloupe Hidalgo.

By that treaty, the United States acquired no right of the soil included in this grant; nothing but the political powers, jurisdiction, and sovereignty, under a special stipulation that the owners of property should be protected in the enjoyment thereof.

Before that treaty, this land had been so completely severed from the public domain of Mexico, so perfectly vested in the grantee by a legal title in fee, that no right of property in the land passed to the United States.

VI. By the laws, usages, and customs in California, all persons, without any distinction between races, had capacity to take and alienate lands. Upon this point of the case, *Mr. Bibb's* citations were very numerous.

1. The governor and departmental assembly considered that Solano's being an Indian did not prevent him from holding land.

2. The laws, customs, and usages of the Mexican government permitted it. Proof of this was in the record by witnesses.

3. These laws, usages, and customs are to be proved as facts.

4. No Christian nation, who planted colonies in North or South America, ever denied to the aborigines the capacity of holding lands as tribes, and of selling them in subordination to the governing nation.

5. But Spain did not consider the Indian right to be that of mere occupancy and perpetual possession; but a right of property in the lands they held under the guaranty of treaties, and so highly respected that, in the establishment of a military post by royal order, the site thereof was either purchased from the Indians or occupied with their permission, as that of St. Mark's. 9 Pet. 752.

6. The capacity of native Indians and their descendants to take individually, by grant in fee-simple, is acknowledged in various treaties between the United States and different tribes of Indians.

7. No nation of white people, who have ever established themselves and their government in America, (however proud and confident in their superiority over the red men who were found in the occupancy of the lands,) have ever denied that the Indians were human beings entitled to the rights of humanity, to the natural rights of holding, and acquiring, and alienating property, real and personal, including the rights of marriage and descent. Here, let us call to mind the marriage of Mr. Rolfe, the white man, with Pocahontas, the Indian princess, whose descendants have held and now hold places of honor and profit, and large estates, real and personal; and let us not forget the virtues of Pocahontas, her courageous acts and noble darings in the cause of humanity, which have made her character illustrious, and her portrait worthy of a niche in the capitol of the United States of America.

8. By the decree of the supreme government of the United Mexican States of 1824, (before quoted,) foreigners, as well as Mexicans were endowed with the capacity to receive grants of land, and to establish themselves thereon. Was Francisco Solano neither a foreigner nor a Mexican? Were native civilized Indians, converted to the Christian faith, in full communion with the established Catholic church, excluded from the privilege of acquiring lands by grants directly from the government?

9. The historical evidence of the revolutions in Mexico, confirms the position that the Indians were capable of buying and selling lands. The plan of Iguala, and treaties of Cordova, and other public documents, all recognize the right.

VII. Although the grant has been so made to Solano in fee, yet it is said that Solano was not authorized, and had not capacity, to sell.

Suppose, for the sake of argument, it were so. Would the act of Solano, in making the deed of bargain and sale, make the grant to him void *ab initio;* annul his capacity to have and to hold, and convey the land to the United States?

The conveyance by Solano to Vallejo was of 10th June, 1842; the treaty of Guadaloupe Hidalgo was signed 2d February, 1848; the ratifications were exchanged 30th May, 1848. During this interval, between the sale and conveyance by Solano and the treaty of Guadaloupe Hidalgo, the Mexican government never complained of any breach of any condition in this grant to Solano; never instituted any proceeding to

divest Solano or his heirs, or the alienee, Vallejo, of the title, and reunite it to the public domain.

At the date of the treaty, Solano was living on the land, and died there, in or about the year 1851; and his alienee, Vallejo, was also in possession and cultivating the land from 1842, until his sale and conveyance to Ritchie, in August, 1850.

VIII. The attorney-general alleges the grant to Solano to have been collusive and fraudulent.

*Mr. Bibb* examined the facts in the case.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the district court for the northern district of California.

The proceedings were originally commenced before the board of commissioners to settle private land claims in California, under the act of congress of March 3, 1851. (9 Stats. at Large, 631.)

A petition was filed before that board by Ritchie against the United States, setting forth a claim to a tract of land known by the name of " Suisun," situate in the jurisdiction of Sonoma, county of Solano, comprising four square Mexican leagues, (nearly 18,000 acres,) praying that the title might be confirmed. The title claimed is derived from a grant by Juan B. Alvarado, governor of California, to Francisco Solano, dated January 28, 1842.

The commissioners, after hearing the proofs in the case, on the 3d of January, 1853, ordered that the title be confirmed to the claimant.

On the 19th of May, 1853, a transcript of the proceedings before the board, with their decision, was filed with the clerk of the United States district court for the northern district of California; and on the 20th of September, 1853, notice of an appeal from the decision to the district court was filed with the clerk by the attorney-general of the United States.

Further testimony was taken in the case, and heard before the court; and at a special term, held at the city of San Francisco on the 8th of November, 1853, the decision of the board of commissioners was confirmed.

The case is now before us on an appeal from the decree of the district court.

Objections have been taken on the part of the appellee to the jurisdiction of the district court, to hear and determine the case; and, also, to the regularity of the appeal from the board of commissioners — assuming the court had jurisdiction — which it will be necessary first to notice.

By the 8th section of the act already referred to, it was made

the duty of the commissioners, within thirty days after their decision, to certify the same, with the reasons on which it was founded, to the district attorney of the United States of the district in which the decision was rendered. And by the 9th section, it is provided that in all cases of rejection or confirmation of any claim by the board, it should be lawful for the claimant or district attorney, on behalf of the United States, to present a petition to the district court praying for a review of the decision ; and that the petition, if presented by the claimant, should set forth the nature of the claim, &c., together with a transcript of the report of the board, and of the documentary and other evidence on which it was founded. And the petition, if presented by the district attorney, shall be accompanied by a transcript of the board, &c., and shall set forth the grounds upon which the claim is alleged to be invalid ; and a copy of the petition shall be served upon the opposite party ; and the party upon whom the service shall be made shall be bound to answer the same within the time prescribed by the judge of the district court, &c. And by the 10th section, it is made the duty of the district court to proceed and render judgment upon the pleadings and evidence in the cause, and upon such further evidence as may be taken by order of the said court ; and, on the application of the party against whom the judgment is rendered, to grant an appeal to the supreme court of the United States. And by the 12th section, to entitle either party to a review of the board of commissioners, notice of the intention to file a petition in the district court shall be entered on the journal of the board within sixty days after the decision of the claim has been notified to the parties ; and the petition shall be filed in the district court within six months after the decision has been rendered.

The mode above prescribed for removing the case from the board of commissioners to the district court was subsequently changed by the 12th sect. of the act of congress passed 31st August, 1852, (10 Stats. at Large, 99.)

This section provides that, in every case in which the board of commissioners shall render a final decision, it shall be their duty to have two certified transcripts of their proceedings and decision, and of the papers and evidence on which the same were founded, made out, one of which transcripts shall be filed with the clerk of the proper district court, and the other transmitted to the attorney-general of the United States ; and the filing of such transcript with the clerk shall, *ipso facto*, operate as an appeal for the party against whom the decision shall be rendered ; and if such decision shall be against the private claimant, it shall be his duty to file a notice with the clerk of the court within six months thereafter, of his intention to prosecute the

appeal, and if the decision shall be against the United States, it shall be the duty of the attorney-general, within six months after receiving the said transcript, to cause notice to be filed with the clerk aforesaid, that the appeal will be prosecuted by the United States.    And on the failure of either party to file such notice with the clerk, the appeal shall be regarded as dismissed.

The removal of the proceedings before the board of commissioners, in this case, to the district court, took place in conformity with the provisions of the act of 1852, and, it is urged by the counsel for the appellee, that it is defective for not complying with the requirement of the 9th section of the act of 1851, in respect to the petition to the district court therein provided for. But we are of opinion that the 12th section of the act of 1852 virtually repeals this section, and thereby dispenses with the petition and answer, as preliminary steps to the hearing in the district court.    They clearly are not essential to the removal of the cause, or perfecting of what is called the appeal, as the 12th section of the act of 1852 makes the filing of the transcript returned by the commissioners operate, *ipso facto*, as an appeal in favor of the party against whom the decision had been rendered.

The filing of the petition and answer in the district court, prescribed by the 9th section, presenting, in the form of pleadings, the issue to be tried, would have been more in conformity with the practice of courts; but, looking to the nature and character of the questions to be heard and determined in these proceedings before the court, the pleadings cannot be of any very great importance, especially as these questions have already been the subject of examination by both parties before the board of commissioners.    The question of practice in the particular case is rather a matter of form than of substance.

It is objected, further, that the 12th section of the act of 1852 makes no provision for notice to the party in whose favor the decision has been rendered by the commissioners, of the appeal to the district court, and that a hearing may be had there, and the decision reversed in his absence.    But he has notice of the appeal, as the filing of the transcript by the board, according to the act, has that effect; and then ordinary diligence will enable the party to be heard on the appeal.    Besides, the court has the power, doubtless, to regulate the time of the hearing, and provide for reasonable notice by its rules, so as to prevent surprise.

It is also objected, that the law prescribing an appeal to the district court from the decision of the board of commissioners is unconstitutional; as this board, as organized, is not a court under the constitution, and cannot, therefore, be invested with any of the judicial powers conferred upon the general govern-

45*

ment. American Ins. Co. *v.* Canter, 1 Pet. 511; Benner *v.* Porter, 9 How. 235; United States *v.* Ferreira, 13 Ib. 40.

But the answer to the objection is, that the suit in the district court is to be regarded as an original proceeding; the removal of the transcript, papers, and evidence into it from the board of commissioners being but a mode of providing for the institution of the suit in that court. The transfer, it is true, is called an appeal; we must not, however, be misled by a name, but look to the substance and intent of the proceeding. The district court is not confined to a mere reëxamination of the case as heard and decided by the board of commissioners, but hears the case *de novo*, upon the papers and testimony which had been used before the board, they being made evidence in the district court; and also upon such further evidence as either party may see fit to produce.

In this respect, the proceeding is somewhat analogous to that before the district court, under the act of congress, 26th May, 1824, §§ 1, 3, (4 Stats. at Large, 52, 53,) concerning French and Spanish grants in the State of Missouri, which had been previously heard before a board of commissioners for confirmation. In these cases, the evidence before the board was received on the hearing in the district court.

This brings us to the merits of the case.

It appears, from the evidence in the case, that Francisco Solano, from whom the appellee derives title, was in the possession and cultivation of the land in question as early as 1832 or 1833; and that, on the 16th January, 1837, he applied for a provisional grant of the same, from M. G. Vallejo, the military commander of the northern frontier of Upper California, and director of colonization. The proceedings are as follows: —

" To the Commandant-General: —

" Francisco Solano, principal chief of the unconverted Indians, and born captain of the ' Suisun,' in due form, before your honor, represents : That, being a free man, and owning a sufficient number of cattle and horses to establish a rancho, he solicits from the strict justice and goodness of your honor that you be pleased to grant him the land of the ' Suisun,' together with its known appurtenances, which are a little more or less than four square leagues, from the ' Portzuela to the Salina de Sucha.' Said land belongs to him, by hereditary right from his ancestors, and he is actually in possession of it; but he wishes to revalidate his rights in accordance with the existing laws of our republic, and of the colonization recently decreed by the supreme government.

" He therefore prays that your honor be pleased to grant him

the land which he asks for, and to procure for him, from the proper sources, the titles which may be necessary for his security, and that you will also admit this on common paper, there being none of the corresponding stamp in this place.

"(Signed)        Francisco Solano.

" *Sonoma, January* 16, 1837."

"*Sonoma, January* 18, 1837.

" The undersigned grants, temporarily and provisionally, to Francisco Solano, chief of the tribes of this frontier and captain of the ' Suisun,' the lands of that name, as belonging to him by natural right and actual possession. Said land is comprehended between the ' Portzuela' and the Salina de Sucha.' The party interested will ask from the governmental of the state the usual titles, in order to make valid his rights in conformity with the new order of colonization.

"(Signed)        M. G. Vallejo."

He continued in the possession and occupation down to 1842, when an application was made by his attorney, Vallejo, to Juan B. Alvarado, constitutional governor of the department of California, for a title in form to the tract, as follows : —

"[SEAL.]    To his Excellency the Governor : —

" The undersigned, a resident of Sonoma, respectfully appears before your excellency, and representation makes, that, in virtue of the rights which belong to him, as shown in the annexed petition and marginal decree, he is in actual possession of the land known by the name of ' Suisun,' together with its dependencies ; and, in order to secure and legalize said ownership, he humbly petitions that your excellency, in consideration of the document referred to, may be pleased to grant him the corresponding title of concession, perpetual and hereditary, of the aforesaid land, in order that, in no time, may the petitioner or his heirs be molested in the pacific enjoyment of his property.

" Wherefore, your petitioner prays that your excellency will deign to grant him the favor which he asks for, he swearing that he is actuated by no malice, and such other oath as is required, &c., &c.

"As attorney of the petitioner,

"(Signed)        Juan Antonio Vallejo.

" *Monterey, January* 15, 1852."

"*Monterey, January* 28, 1842.

" In consideration of the petition at the beginning of this *expediente,* the report of the commandant-general, and the merits and services of the Indian called Francisco Solano, ren-

dered on the frontier of Sonoma, I declare him to be owner in fee of the place called 'Suisun,' in extent four square leagues, and with the boundaries shown in the corresponding map. The corresponding patent will be made out, and this *expediente* directed to the most excellent departmental junta for its approbation.

"Juan B. Alvarado, constitutional governor of the department of the Californias, thus ordered, decreed, and signed. Of which I certify."

And, on the 21st January, 1842, the title in form was granted, as follows : —

"[SEAL.] Juan B. Alvarado, constitutional governor of the department of the Californias.

" Whereas the aboriginal Francisco Solano, for his own personal benefit and that of his family, has asked for the land known by the name of 'Suisun,' of which place he is native, and chief of the tribes of the frontiers of Sonoma, and being worthy of reward for the quietness which he caused to be maintained by that unchristianized people ; the proper proceedings and examinations having previously been made, as required by the laws and regulations ; using the powers conferred on me in the name of the Mexican nation, I have granted to him the above-mentioned land, adjudicating to him the ownership of it. By these presents, being subject to the approbation of the most excellent departmental junta, and to the following conditions, to wit : —

" 1. That he may inclose it, without prejudice to the crossings, roads, and servitudes, and enjoy it freely and exclusively, making such use and cultivation of it as he may see fit; but within one year he shall build a house, and it shall be inhabited.

" 2. He shall ask the magistrate of the place to give him juridical possession of it, in virtue of this order, by whom the boundaries shall be marked out; and he shall place in them, esides the landmarks, some fruit or forest trees of some utility.

" 3. The land herein mentioned is to the extent of four 'sitios de ganado mayor,' (four square leagues,) with the limits as shown on the map accompanying the respective *expediente*. The magistrate who gives the possession will have it measured according to ordinance, leaving the excess that may result to the nation, for its convenient uses.

" 4. If he shall contravene these conditions, he shall lose his right to the land, and it may be denounced by another.

" In consequence, I order that these presents be held firm and valid, that a register be taken of it in the proper book, and that

it be given to the party interested, for his voucher and other purposes.

" Given this twenty-first day of January, one thousand eight hundred and forty-two, at Monterey.

" (Signed)      JUAN B. ALVARADO.
" (Signed)      MANUEL JIMENO, *Secretary*."

On the 3d October, 1845, the grant was approved by the departmental assembly, as follows : —

" Most Excellent Sir : —

" The committee on vacant lands has ordered the *expediente*, formed at the instance of the Indian, (Indigena,) Francisco Solano, for the place known by the name of ' Suisun,' and being satisfied that the proceedings had in the said *expediente* were sufficient for the purpose, that the superior government should have granted the said place, offers to the deliberation of your excellency the following proposition : —

" The grant made by the superior government of the department by a title legally issued, with the date 28th January, 1842, in favor of the Indian, (Indigena,) Francisco Solano, of the place known by the name of ' Suisun,' and situated in the jurisdiction of Sonoma, in accordance with the law of August 18, 1824, and article 5 of the regulations of November, 1828, is approved.

" Hall of the committee, in the city of Los Angelos, September 29, 1845.

" (Signed)      FRANCISCO DE LA GUERRA.
" (Signed)      MARCESO BARTELA."

" *Angelos, October* 3, 1845.

" In session of this day, the proposition of the foregoing report was approved by the most excellent departmental assembly, ordering the original *expediente* to be returned to his excellency the governor, for suitable purposes.

" (Signed)      PIO PICO, *President*.
" (Signed)      AUGUSTIN OLONA, *Secretary*.

" On the same day, the proper copy was issued to the party interested."

The tract was duly surveyed, the boundaries fixed, and the grantee put in judicial possession, in conformity with the conditions of the grant, and which possession corresponded with the provisional possession previously ceded to him in 1837.

On the 10th May, 1842, Solano sold and conveyed the premises to Mariano Guadaloupe Vallejo, in full property, for the consideration of one thousand Mexican dollars ; and, on the 29th May, 1850, Vallejo sold and conveyed the same to A. A. Ritchie, the appellee, for the consideration of fifty thousand collars.

No question is made as to the genuineness and good faith of the original grant to the Indian, Solano, nor but that it was made by the competent authority of the government to dispose of the public lands.

The only objections taken to its validity, and upon which it is denied that it had the effect and operation to separate the lands granted from the public domain, are: 1. That Solano, being an Indian, was not competent, according to the laws of Mexico concerning the disposition of the public lands at the time of the grant, to take and hold real property; and hence, that the grant by the governor, and approved by the departmental assembly, was inoperative and void; and, 2. That, if it should be held that Solano was competent to take and hold real property, still, the grant is void, on the ground that the tract known by the name of " Suisun " belonged to the mission lands in California, which the public authorities of that department had no power to grant.

1. In answer to the first objection, we are referred to the plan of Iguala, adopted by the revolutionary government of Mexico, 24th February, 1821, a short time previous to the subversion of the Spanish power in that country, in which it is declared, that " all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy, with a right to be employed in any post according to their merit and virtues;" and that "the person and property of every citizen will be respected and protected by the government." We are also referred to the treaty of Cordova, 24th August, 1821, between the Spanish viceroy and the revolutionary party, by which the independence of the country was for the time established; and to the declaration of independence issued 28th September, 1821, all reaffirming the principles of the plan of Iguala.

Two decrees of the first Mexican congress are also referred to ; one adopted 24th February, 1822, and the other 9th April, 1823.

The first: " The sovereign congress declares the equality of civil rights to all the free inhabitants of the empire, whatever may be their origin in the four quarters of the earth." The other reaffirms the three guarantees of the plan of Iguala: 1 Independence. 2. The Catholic religion; and 3. Union of all Mexicans of whatever race.

There is, also, another act of the Mexican congress of the 17th September, 1822, carrying into practical effect this fundamental principle of the new government, as follows: " The sovereign Mexican constituent congress, with a view to give due effect to the 12th article of the plan of Iguala, as being one

of those which form the social basis of the edifice of our independence, has determined to decree and does decree,

" Art. 1. That in every register and public or private document, on entering the name of citizens of this empire, classification of them with regard to their origin shall be omitted.

" Art. 2. That although by virtue of the preceding article, there shall be no distinction of class on the parochial books, that which is at present observed will be continued in the regulations for the graduation of the civil and ecclesiastical taxes, until these shall be arranged in some other method more just and proper."

In consistency with this fundamental principle of the Mexican government, as declared in the several acts above referred to, namely, the citizenship of all the inhabitants, without distinction of blood or race, is the 9th article of the decree of 18th August, 1824, on colonization, which provides, that " in the distribution of the lands, Mexican citizens are to be preferred, and between them no distinction shall be made except such only as is due to special merit and services rendered to the country, or in equality of circumstances, residence in the place to which the lands to be distributed are pertinent; and the 16th article provides, that " the government, conformably to the principles established in this law, shall proceed to the colonization of the territories of the republic."

Upper California, in which the lands in question are situate, was one of those territories. And the first regulation made for colonizing the territories, which was 21st November, 1828, provided " that the governors of the territories are authorized, in compliance with the laws of the general congress of 18th August, 1824, and under the conditions hereafter specified, to grant the vacant lands in their respective territories to such contractors, (*empresarios*,) families or single persons, whether Mexicans or foreigners, who may ask for them for the purpose of cultivating or inhabiting them."

The Indian race having participated largely in the struggle resulting in the overthrow of the Spanish power, and in the erection of an independent government, it was natural that in laying the foundations of the new government, the previous political and social distinctions in favor of the European or Spanish blood should be abolished, and equality of rights and privileges established. Hence the article to this effect in the plan of Iguala, and the decree of the first congress declaring the equality of civil rights, whatever may be their race or country. These solemn declarations of the political power of the government had the effect, necessarily, to invest the Indians with the privileges of citizenship as effectually as had the

declaration of independence of the United States, of 1776, to invest all those persons with these privileges residing in the country at the time, and who adhered to the interests of the colonies.   3 Pet. 99, 121.

The improvement of the Indians, under the influence of the missionary establishments in New Spain, which had been specially encouraged and protected by the mother country, had, doubtless, qualified them in a measure for the enjoyment of the benefits of the new institutions.   In some parts of the country very considerable advancement had been made in civilizing and christianizing the race.   From their degraded condition, however, and ignorance generally, the privileges extended to them in the administration of the government must have been limited; and they still, doubtless, required its fostering care and protection.

But as a race, we think it impossible to deny, that, under the constitution and laws of the country, no distinction was made as to the rights of citizenship, and the privileges belonging to it, between this and the European or Spanish blood.   Equality between them, as we have seen, has been repeatedly affirmed in the most solemn acts of the government.

Solano, the grantee in this case, was a civilized Indian, was a principal chief of his race on the frontiers of California, held a captain's commission in the Mexican army, and is spoken of by the witnesses as a brave and meritorious officer.

Our conclusion is, that he was one of the citizens of the Mexican government at the time of the grant to him, and that, as such, he was competent to take, hold, and convey real property, the same as any other citizen of the republic.

2. As to the objection that the tract in question belonged to the mission lands, which the public authorities in California had no power to grant, there appears to be no foundation for this objection.

As early as 17th August, 1833, the Mexican congress decreed that "the government will proceed to secularize the missions of Upper and Lower California;" and various regulations are prescribed for carrying this policy into effect.

Again, 26th November, the same year, it is declared that "the government is empowered to adopt all measures which shall secure the colonization and render effective the secularization of the missions in Upper and Lower California, being authorized to use in the most convenient manner the property devoted to pious uses, in the said territories, for that purpose."

Again, by a decree of 14th April, 1834, it is declared that "all the missions of the republic will be secularized."

Under these laws, the authorities empowered to grant the

public lands have dealt with these mission establishments the same as with any other portions of the public domain; the clergy, who previously had the charge and control of them, being confined simply to the ecclesiastical and spiritual direction and government of the missions.

We could refer, had we time, to a body of authority on this part of the case, in addition to that above mentioned; but we deem it unnecessary, and shall close by affirming the decree of the district court.

It is conceded that the lands in question do not belong to the class called Pueblo lands, in respect to which we do not intend to express any opinion, either as to the power of the authorities to grant or the Indians to convey.

Mr. Justice CAMPBELL.

I concur in the judgment of the court upon the facts disclosed in the record.

I am unable to find evidence to show that the lands in dispute were attached to the mission of San Francisco Solano, for the single sentence in the deposition of Vallejo, "that in 1835, according to the rules of secularization, the grantee had acquired the rights of possession," is too vague, and include too little of a reference to facts to rest any argument that the grant to Solano was of mission lands, contrary to the laws of Mexico. I therefore am not willing to pass any judgment upon the subject of the mission lands of California. Nor do I consider that the sufficiency of the conveyance from Solano to Vallejo, a question before us. The conveyance of Solano was recognized before a public officer, and has been followed by possession. For the purposes of this case this is sufficient. This was decided in Percheman's case, 7 Pet. 51–98. The court say there, that the questions upon the validity of mesne conveyances have no interest to the United States, and they cannot be investigated or decided.

## Order.

This cause came on to be heard on the transcript of the record, from the district court of the United States for the northern district of California, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said district court in this cause be and the same is hereby affirmed.