THE UNITED STATES *v.* MANUEL VARELA. THE UNITED STATES *v.* MARTIN KOSLOWSKI. THE UNITED STATES *v.* ANTHONY JOSEPH.

ACTION FOR PENALTY UNDER INTERCOURSE ACT OF 1834.—An action for the penalty prescribed by the intercourse act of 1834 for settling on Indian lands, is maintainable only respecting land belonging, secured, or granted to an Indian tribe "by treaty with the United States," and a petition not showing that fact, but alleging that the land settled on belonged to a pueblo of Indians, and was secured to them "by patent from the United States," is bad on demurrer. [See also the head-notes to the preceding case.]

APPEALS from the first judicial district. The plaintiffs in these causes appeal to this court from the judgment of the district court for the first judicial district, at the February and July terms, 1873, sustaining the defendants' demurrer to their petition. Plaintiffs sued to recover from defendants the sum of one thousand dollars prescribed in the eleventh section of the act of congress, approved June 30, 1834, entitled "An act to regulate trade and intercourse with the Indian tribes," etc., for the alleged settlement by defendants on lands belonging to the pueblo tribes of Indians of Pecos and Taos, and secured to them by patents from the United States.

---

* Judgment affirmed in the United States supreme court. See 94 U. S. (4 Otto) 619.

*T. B. Catron,* for the United States, relied upon the same points in each of these cases as in the preceding case of *The United States* v. *Santistevan.*

*Joab Houghton,* for Varela and Koslowski, appellees. This was an action of debt brought by the plaintiff against the defendants for a penalty for settling on the lands belonging to the Indians of the pueblo of Pecos. To the petition of said plaintiffs a demurrer was filed by said defendants, which demurrer was sustained by the court and the petition dismissed, and the cause brought to this court by appeal. The statute imposing a penalty upon persons for settling on Indian lands clearly intends such Indians as are not citizens, but under the wardship of the government: 4 U. S. Stats. at Large, sec. 11, p. 726. The pueblo Indians are citizens, and as free to enjoy all the privileges of citizenship as any other inhabitant in the country: Collection of decrees by Mariano Galvani, published in Mexico, vol. 1, secs. 12, 13, p. 4, and sec. 1, p. 32; also vol. 2, sec. 15, pp. 1, 80, 92, 127. The right of citizenship was secured to the Indians under the republic of Mexico by the laws above referred to, and those rights were secured to them under our government. Such citizens, by the treaty between the Mexican republic and the United States, bearing date February 2, 1848, and commonly known as the treaty of Guadalupe Hidalgo: See 9 U. S. Stat. at Large, pp. 929, 930, arts. 8, 9. All of the Mexican authorities above referred to declare all Indians, Africans, and Europeans, without distinction of race, to be entitled to citizenship, and consequently to the appellation of Mexican, the word used in said treaty, and as entitled to the protection of the United States government in their rights of citizenship, one of the most dear of which is the right to enjoy and dispose of their property as to them may seem most convenient. As to the right of Indians to take, hold, and dispose of their landed property, see *United States* v. *Ritchie,* 17 How. 539, 540. Then, as Indians have the right to dispose of their property the same as any other citizens, persons settling on their lands are not liable to the pains and penalties prescribed by the statute above referred

to, and if the Indians should not be satisfied, as they are the only persons entitled to complain, they must resort to the courts of the country for relief, the same as any other citizen. The political department of the United States government does not regard the pueblo Indians of New Mexico as tribes, or holding tribal relations, but by act of congress, approved December 22, 1858, they are held as citizens, and patents for their lands are ordered to be given as such: 11 U. S. Stats. at Large, 374.

*Breeden and Waldo,* for Joseph, appellee.

By Court, JOHNSON, J.:

The matter of demurrer in these causes are substantially of the same nature and effect as in case No. 69, *The United States* v. *Juan Santistevan, ante,* 583, my opinion in which is here referred to as my opinion in these causes. The plaintiffs' petition in these causes does not show right of action under the statute, and for this reason, if for no other, the causes should be returned to the court below, for such disposition as may be agreeable to the practice of said court, the judgment of that court on demurrers being considered as sustained.*

BRISTOL, J., delivered the following separate opinion in Joseph's case:

In this cause, and the three others referred to in this opinion, I concur in the opinion of the court in its conclusions as to the disposition of the same, though I arrive at those conclusions in some respects by a different course of reasoning. The material allegations in the declarations in this and the other causes referred to are substantially as follows: That the defendant at (naming the time) made a settlement on, and now occupies and is settled on, lands of the pueblo tribe of Indians of the pueblo of (naming it), situated in the county of (naming it), in said district and territory, said lands being described as follows, to wit (describing them), and then and there building houses and making fields thereon, contrary to the form of the statute

---

* Judgment affirmed in United States supreme court: 94 U. S. (4 Otto) 615.

in such case made and provided, said lands then and there, and at the time of bringing this suit, belonging to the said pueblo tribe of Indians, of the pueblo aforesaid, and secured to the said pueblo tribe of Indians of the pueblo aforesaid, by patent from the United States, whereby and by force of the statute in such case made and provided, an action hath accrued to the said United States, etc. A demurrer to the entire declaration was interposed in the court below, which was sustained, and judgment entered accordingly. The case is before this court on appeal from that judgment.

Like proceedings were had in the case of the *United States* v. *Manuel Varela*, the case of the *United States* v. *Juan Santistevan*, and the case of the *United States* v. *Martin Koslowski*, except that the two cases last named are here on writ of error. All these cases involve a like statement of facts, and as the same points are to be determined, they will all be disposed of in one opinion.

The only question to be considered is whether each of the declarations in these several causes presents a *prima facie* case under the statute. The act of congress of June 30, 1834, U. S. Stats. at Large, 729, is the only statute under which an action of this kind can be sustained. These several suits were, doubtless, intended to be brought under the eleventh section of that act. The term "any Indian tribe," used in that section, must, in my opinion be construed with a certain limitation. It must be confined to Indian tribes holding certain specific relations with the United States, which are well defined in the several provisions of that act; and we must look to the entire act, to ascertain what these relations are. A subsequent act of congress has extended the provisions of the former act, as far as applicable, over the Indian tribes of New Mexico. But to determine the applicability of the latter act, reference must be made to the former act exclusively.

It seems clear, that the Indian tribes to which these acts of congress can only apply, are such as may be classed as distinct, independent, domestic nations, having and maintaining distinct tribal organizations, capable of maintaining

the relations of peace and war; who maintain their own natural rights, including that of governing themselves as independent political communities, and who as such independent political communities hold only treaty relations with the United States, very much on the footing of *quasi* foreign nations. The only other relations are such as the United States may gratuitously assume, as a superior power and as a protectorate. All these relations are expressly indicated by the acts referred to, and the various adjudications in reference to the class of Indian tribes embraced in such acts.

It would seem to follow from these relations that contracts and conveyances can be entered into and made between such communities and the government, only by treaty, and, therefore, that the only way in which the United States can contract with these independent domestic nations, whereby public lands can be secured or granted to them, is by or under a treaty. As soon as these relations cease to exist, they lose their character and identity as distinct and independent political communities, and at once become merged in and identified with our own body politic, subject and amenable to our laws, and can no longer be considered as wards of the government.

There is another distinguishing feature, whereby the Indian tribes, to which the statute can only apply, may be identified, and that is, they must be Indian tribes with whom all intercourse must be carried on exclusively by or under the direction of the general government.

One of the questions to be determined is whether from the term "pueblo tribe of Indians" of a certain designated "pueblo," in the absence of any other descriptive allegation in the declaration, the court can rightfully infer that it is such an "Indian tribe" as is covered by the statute, and between whom and the general government the distinctive relations I have pointed out necessarily subsist. The words of the statute are "Indian tribe;" the words of the declaration are "pueblo tribe of Indians of a pueblo." A word is here used in pleading that is unknown to the English language, except by common consent as descriptive of

these peculiar Indian communities, and their places of abode. The Spanish word "pueblo," originally applied to these communities by Spain, whose subjects they formerly were, and for a purpose, is something more than a mere name, such as Apache, Comanche, or Navajo. Pueblo, as defined in the Spanish language, signifies inhabited town or village, and in the plural is used to designate either towns or the inhabitants of towns. As applied to these Indian communities it is significantly descriptive of a race and their habitations, which plainly distinguishes them from the nomadic tribes in their habits; as thus applied it has a popular and well-defined signification in New Mexico. In construing the language of the declaration, is it not proper to apply that signification?

It is claimed that the term "Indian tribe," without other qualifying words, in its ordinary acceptation signifies a tribe between whom and the general government subsist all the relations I have pointed out, which exist between the government and the tribes occupying what in the statute is technically designated as "Indian country." Would it not be just as consistent to claim that a pueblo tribe of Indians of a pueblo, in the ordinary acceptation of that phrase, signifies a community living in permanent habitations, constituting a town, subsisting by their own industry in the cultivation of the soil and other branches of husbandry, and carrying on trade and general intercourse with the people of the territory, precisely as do the inhabitants of any Spanish or Mexican town? These are certainly among the distinguishing characteristics of pueblos, as commonly understood among the people of New Mexico. To communities with habits such as these, of long standing, I apprehend the courts would meet with grave embarrassments in attempting to apply the penal non-intercourse laws of the United States, in like manner as to nomadic tribes of the "Indian country."

Counsel for the defendants in error in these cases claim that these pueblos were citizens upon an equality with all other citizens of Mexico, by virtue of the plan of Iguala, treaty of Cordova, and laws of Mexico, and as such were

competent to take, hold, and convey real estate; that in that capacity, and with these rights, they were received by the United States, and their rights confirmed under the treaty of Guadalupe Hidalgo. Great reliance seems to have been placed upon this point in the court below, as well as in this court. In support of this view, the court is referred to the case of *The United States* v. *Ritchie*, 17 How. 525. In that case, though citizenship of an Indian does not seem to have been alleged in pleading, as an issuable fact, yet there were certain facts alleged and established, such as the date of a grant and continual occupancy, whereby the court was enabled to take judicial notice of citizenship as a necessary consequence of those facts, the laws of Mexico and the treaty of Guadalupe Hidalgo. These Mexican laws relating to citizenship and rights of property, being in force at the time of that treaty, and extended thereby to the people of the newly ·acquired territory, became to that extent adopted laws of the United States, and as such federal courts take judicial notice of them: *United States* v. *Turner et al.*, 11 Id. 663.

In the cases under consideration, as in the case of *The United States* v. *Ritchie*, the fact of citizenship can not be inferred directly from the allegations of the pleadings. The lands of these pueblos are alleged in the several declarations, to have been secured to them by patents from the United States. Patents, if issued, must have been issued by authority of some law of congress; and this leads us to inquiry as to the existence of any such law. The only law on the subject is an act of congress of December 22, 1858, entitled "An act to confirm the land claims of certain pueblos and towns in the territory of New Mexico:" 11 U. S. Stats. at Large, 374. This is in the nature of a private statute, though it is classed among and seems to be recognized as one of the public acts, and as such may, perhaps, be judicially noticed. This act confirmed the land claims of these identical pueblos to the identical lands in question, and authorized the issuing of patents, conveying to the patentees all title and claim thereto of the United States. The act itself was a conveyance independent of a

patent, and is even better evidence of title than the patent under it: *Grignon* v. *Astor*, 2 How. 319.

The patents referred to in the declarations, if issued, must have been issued under the provisions of that act. The act itself does not recite the terms of the land claims confirmed, but refers severally to the reports of the surveyor-general, which had become state papers, and by necessary implication makes these reports a part of the act. By reference to these reports we find that these pueblo land claims thus confirmed are old Spanish grants. We here have a clue to the whole matter relating to these pueblo lands, and rightfully infer from the facts disclosed that these pueblos must have been received by the United States under the treaty of Guadalupe Hidalgo, and that by virtue of that treaty and the laws of Mexico, then in force, they came under the jurisdiction of the United States as citizens, and that they must be regarded as Mexicans, according to their rights, merits, and virtues.

It matters little what construction may be attempted to be put on the word "belonging," used in these declarations, for the purpose of bringing these lands within the operation of the statute under which suit is brought; for in whatever manner the lands in question may be claimed ever to have belonged to these pueblos, other than by virtue of this act of congress, it must have been an inferior interest, that was merged in the paramount title conferred by such act. We must, therefore, look to the provisions of this act as the only guide in determining the question as to how these lands belonged or were secured to these pueblos at the time the suits were brought.

It is a noticeable fact that congress considered these pueblo land claims, confirmed them, and divested all title and claim thereto of the United States, without any treaty, or in any manner recognizing these pueblos as independent domestic nations; but, on the contrary, considered and disposed of these claims in connection with, and on the same footing as other Spanish land grant claims of Spanish or Mexican towns. The public recognition in this way of these pueblos to me seems very significant, and to preclude

the presumption that they are Indian tribes, to whom or to whose lands, these penal non-intercourse laws can apply.

While I am perfectly satisfied that these are the facts, as they actually existed at the instituting of these suits, showing the precise interest and title of these pueblos to these lands, I can not say that I am as well satisfied with this roundabout way of getting at them.   If, however, the averments of the declarations will not admit of this view, then it seems clear that they are too vague and uncertain to be recognized as good pleading.   One of the, points assigned by the plaintiffs in error is that the pueblo Indians have been recognized by the federal departments as Indians in the ordinary acceptation of the term, and have referred the court to the two cases of *The United States* v. *Haas*, and *The United States* v. *Holliday*, 3 Wall. 407.   The defendants in those cases were indicted for selling liquor to Indians, under a United States statute which declares that "if any person shall sell any spirituous liquors to any Indian under the charge of any Indian superintendent or Indian agent, appointed by the United States, shall, on conviction thereof (before the proper court), be fined," etc.

The indictment and pleas contained averments that the Indians specified were under such "charge."   The fact, therefore, was admitted by the pleadings, and was among the established facts, certified up with the division of opinion of the circuit to the United States supreme court.   But the declarations in these pueblo cases contain no averments that the pueblo Indians have been recognized, either by the executive or other political departments of the government, as Indians in the ordinary acceptation of the term; and as there has been no public recognition by the executive under the treaty-making power, that point can not be considered as raised.

I now come to the class of lands to which the act of the thirtieth of June, 1834, can only apply.   These lands, in my opinion, must be embraced in what by that act is designated as "Indian country."   This "Indian country," under the laws of the United States, embraces only territory which, though sometimes located within, is completely

set apart from, and forms no part of any of the states or organized territories; and within the territory thus set apart, all intercourse with the Indians must be carried on exclusively by the general government. Under the federal laws, two classes of lands only can be included in "Indian country;" one class comprehends those wild and unreclaimed regions west of the Mississippi river, which at the time of the passage of the act of the thirtieth of June, 1834, were and had been from time immemorial, in the occupation of various nomadic Indian tribes. The lands within these unreclaimed regions, and thus occupied, were regarded by the government as " belonging " to the Indians, and in the meaning of the act, this is the only way in which lands can be considered as " belonging " to Indians, except by treaty. The other class of lands designated as "Indian country" are such as are denominated Indian reservations, which have been set apart under treaty stipulations, by definite boundaries, for the exclusive occupation of certain tribes.

From the facts disclosed it is apparent that these pueblo lands do not belong to either of these classes, and can not therefore be recognized as "Indian country."

The statute under which these suits are brought is in the nature of a penal statute. Its provisions must be construed strictly, and can not be extended by implication. Patents have sometimes been issued to Indians belonging to the class of independent domestic nations; but such patents, I believe, have always been issued in pursuance of treaty stipulations. This was the case with the Shawnees, the Weas, and the Miamis: 5 Wall. 737. Lands thus secured to Indians, would doubtless be considered " Indian country," unless there were conditions that would preclude that inference.

My conclusions are, that neither these pueblos nor their lands, secured to them in the way they have been, are such as are covered by the act of the thirtieth of June, 1834; and that the averments in either of the declarations do not present a *prima facie* case.[*]

[*] Judgment affirmed in the supreme court of the United States. See 94 U. S. (4 Otto) 614–619.