FILED
United States Court of Appeals
Tenth Circuit

July 21, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PUEBLO OF JEMEZ, a federally
recognized Indian Tribe,

     Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee.

------------------------------------------------------

THE NATIONAL CONGRESS OF
AMERICAN INDIANS; THE
ASSOCIATION ON AMERICAN
INDIAN AFFAIRS; AMERICANS FOR
INDIAN OPPORTUNITY; INDIAN
LAND TENURE FOUNDATION;
NATIVE LANDS INSTITUTE

     Amici Curiae.

No. 13-2181
(D.C. No. 1:12-CV-00800-RB-RHS)
(D. N.M.)

_____

**ORDER**
_____

Before **PHILLIPS**, **SEYMOUR**, and **MORITZ**, Circuit Judges.
_____

This matter is before the court, *sua sponte*, to make a correction to footnote 9 on

page 15 of the Opinion issued originally on June 26, 2015. We have also, at the

appellant's request, added the name of counsel to the attorney listing on the decision. The

revised Opinion is attached to this order, and shall issue *nunc pro tunc* to the original

filing date. The deadline for filing any petition for rehearing in this matter remains September 9, 2015.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

June 26, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

PUEBLO OF JEMEZ, a federally recognized
Indian Tribe,

     Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

     Defendant-Appellee.

_____

THE NATIONAL CONGRESS OF
AMERICAN INDIANS; THE ASSOCIATION
ON AMERICAN INDIAN AFFAIRS;
AMERICANS FOR INDIAN OPPORTUNITY;
INDIAN LAND TENURE FOUNDATION;
NATIVE LANDS INSTITUTE,

     Amici Curiae.

No. 13-2181

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:12-CV-00800-RB-RHS)**

---

Karl E. Johnson (Thomas E. Luebben, Of Counsel; and Randolph H. Barnhouse on
the briefs) of Johnson Barnhouse & Keegan LLP, Los Ranchos De Albuquerque,
New Mexico, for Plaintiff-Appellant.

Robert P. Stockman, Attorney, Environment & Natural Resources Division, U.S.
Department of Justice, Washington, D.C. (Sam Hirsch, Acting Assistant Attorney
of General; Mark R. Haag and Kenneth D. Rooney, Attorneys, Environment &

Natural Resources Division, U.S. Department of Justice, Washington, D.C., with him on the brief; Cassandra Casaus Currie, Office of the General Counsel, U.S. Department of Agriculture, and Michael Williams, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., Of Counsel on the brief) for Defendant-Appellee.

Kim Jerome Gottschalk, Susan Y. Noe, and Matthew L. Campbell, of Native American Rights Fund, Boulder, Colorado, filed an Amici brief for The National Congress of American Indians and The Association on American Indian Affairs.

Gregory P. Barbee of Sheppard Mullin Richter & Hampton, LLP, Los Angeles, California, filed an Amici brief for Americans for Indian Opportunity, Indian Land Tenure Foundation, and Native Lands Institute.

---

Before **PHILLIPS**, **SEYMOUR**, and **MORITZ**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

The history of Indian law and in particular "decisions of the Supreme Court recognizing the validity of original Indian title[1] make the existence and extent of such aboriginal ownership a relevant issue in title examinations whenever a chain of title is traced back to a federal grant or patent." Felix S. Cohen, *Original Indian Title*, 32 Minn. L. Rev. 28, 43 (1947).[2] Not surprisingly, then, "[g]rantees

---

[1] The term original Indian title is also referred to as "aboriginal title, unrecognized title . . . or simply Indian title." *See Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1075 (2d Cir. 1982) (internal quotation marks omitted).

[2] Cohen served as the Associate Solicitor and Chairman of the Board of Appeals for the United States Department of the Interior. He received his B.A. from the College of the City of New York in 1926, and then obtained an M.A. and

(continued...)

-2-

who have relied on the Great Seal of a federal department as assuring the validity of land grant titles have not infrequently discovered to their sorrow the truth of the old French saying, 'Meme le plus belle fille du monde ne peut donner que ce que l'a.' Not even the Federal Government can grant what it does not have." *Id.*

The Pueblo of Jemez brought this action against the United States under the federal common law and the Quiet Title Act (QTA), 28 U.S.C. § 2409a, *et seq.*, seeking to quiet its allegedly unextinguished and continuing aboriginal title to the lands of what is now the Valles Caldera National Preserve. The government filed a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The district court held it lacked subject matter jurisdiction as a matter of law and dismissed the action pursuant to Rule 12(b)(1). It reasoned that sovereign immunity barred the action based on its conclusion that the Jemez Pueblo's title claim against the United States accrued in 1860 when the United States granted the lands in question to the heirs of Luis Maria Cabeza de Baca (the Baca heirs). The claim thus fell within

---

²(...continued)
a Ph.D. from Harvard University in 1927 and 1929, respectively. Cohen also received his law degree from Columbia University in 1931. He authored the Handbook of Federal Indian law in 1942 and went on to publish many influential books and law review articles, including *The Spanish Origin of Indian Rights in the Law of the United States*, 31 Geo. L.J. 1 (1942), and *Original Indian Title*, 32 Minn. L. Rev 28 (1947).

the exclusive jurisdiction of the Indian Claims Commission Act (ICCA),[3] which

waived sovereign immunity and provided a cause of action to all Indian claims

against the government that accrued before 1946 so long as they were filed within

a five year statute of limitations period. ICCA § 12, 25 U.S.C. § 70k (1976).

Because the claim was not so filed, it became barred by sovereign immunity.

The Jemez Pueblo appeals, contending that its aboriginal title was not

extinguished by the 1860 grant to the Baca heirs and that its claim for interference

with its Indian title did not accrue until 2000, after the United States acquired an

interest in the Valles Caldera and began interfering with the Jemez Pueblo's access

to the land. Therefore, it argues, it has a current claim against the United States

under the QTA.

We reverse and remand for further proceedings. This appeal is not about

whether the Jemez Pueblo holds aboriginal title. On remand, the Jemez Pueblo

will have to prove that it had, and still has, aboriginal title to the land at issue in

the case. This appeal concerns whether the 1860 Baca grant extinguished the

Jemez Pueblo's alleged aboriginal title to the lands which are the subject of this

action. We hold it did not and the district court erred in concluding, as a matter of

law, that the 1860 Baca grant itself provided a pre-1946 claim against the United

---

[3] Act of Aug. 13, 1946, ch. 959, Pub. L. No. 79-726, 60 Stat. 1049
(formerly codified as amended at 25 U.S.C. §§ 70 to 70n-2 (1976) (omitted from
current Code because the Indian Claims Commission (ICC) terminated on
September 30, 1978)).

States the Jemez Pueblo could have brought under the ICCA. Accordingly, we reverse the district court's dismissal of this action for lack of subject matter jurisdiction.

We also decline the government's alternative invitation to dismiss the action for failure to state a claim under Rule 12(b)(6), an issue the district court did not address. We are not persuaded the Complaint fails as a matter of law to state a claim.

On remand, the Jemez Pueblo will have the burden to establish, as a matter of fact, that it has aboriginal title. In so doing, it will also necessarily be establishing that it did not have a pre-1946 claim against the United States for permitting interference with its aboriginal title.

# I

# BACKGROUND

## A. The Jemez Pueblo

The following facts are taken directly from the Complaint, which we accept as true and view in the light most favorable to the plaintiff. *See Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010) (Rule 12(b)(6)); *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (Rule 12(b)(1)).[4]

---

[4] A Rule 12(b)(1) motion "to dismiss for lack of subject matter jurisdiction
(continued...)

The ancestral Jemez people have used and occupied the lands of the Valles Caldera National Preserve and the surrounding areas in the Jemez Mountains of New Mexico since at least 1200 CE.[5]  The ancestral Jemez, whose descendants comprise the modern Jemez Pueblo, a federally recognized tribe, have for more than 800 years been the predominant and primary occupants and land users of the Jemez Mountains, including the Valles Caldera National Preserve and the greater Rio Jemez watershed.  The Valles Caldera is a dormant crater of a supervolcano located at the center of the Jemez Mountains.  The crater rim itself is twenty miles in diameter and is surrounded by four high-mountain valleys and eleven resurgent volcanic domes.  The crater rim, high-mountain valleys, and volcanic domes are

_____

[4](...continued)
take[s] two forms:" either a "facial" or a "factual" attack.  *Holt*, 46 F.3d at 1002.  A "facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint," and in reviewing a facial attack "a district court must accept the allegations in the complaint as true."  *Id.*  In reviewing a factual attack, "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends," which does not allow a reviewing court to "presume the truthfulness of the complaint's factual allegations."  *Id.* at 1003.  Instead, it gives the court "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Id.*  Here, the district court accepted the allegations in the Complaint as true and did not hold an evidentiary hearing.  We therefore also accept as true the factual allegations of the Complaint.

[5] CE stands for "of the common era." Chicago Manual of Style 468 (16th ed. 2010).  Using the Common Era is an alternative way of expressing the concept denoted by AD and is used as a "neutral" chronological term that is "not specifically anchored in Christianity and therefore sensitive to all and any of the world's religions and belief systems."  Macmillan Dictionary, http://www.macmillandictionary.com/us/buzzword/entries/common-era.html (last visited January 21, 2015).

located within the exterior boundaries of the Valles Caldera National Preserve.

The Jemez Pueblo is made up of the ancestral Jemez populations of Towa-speaking pueblos, including the Pecos Pueblo and the Jemez Pueblo village of Walatowa. The ancestral Jemez Pueblo's aboriginal title allegedly included the Rio Jemez drainage and the Valles Caldera, an area known to the Pueblo Jemez as the "western Jemez homeland."[6] Aplt. App. at 9 ¶ 17. The western Jemez homeland includes a portion of the land at issue in this case within the Valles Caldera National Preserve and covers an area of more than 1,100 square miles in and around the Jemez Mountains. It includes the entire Rio Jemez drainage system above Walatowa, the modern Jemez Pueblo village, and sections of the Rio Puerco drainage west of the Jemez Mountains.

The western Jemez homeland contains ancestral Jemez Pueblo villages, sacred areas, and ceremonial shrines where the ancestral Jemez have lived since migrating from the mesa and canyon country to the northwest prior to 1200 CE. The Jemez Pueblo's oral history refers to the area to the northwest and describes the great southern migration to its western Jemez homeland. Archeological investigations in the western homeland have found at least sixty pueblo villages linked with a network of trails and many thousand farmhouse sites, agricultural

---

[6] In its Complaint, the Jemez Pueblo explains that references to the "'western Jemez homeland' . . . are synonymous with references to the 'Jemez Pueblo aboriginal Indian title area.'" Aplt. App. at 9 ¶ 18.

fields, ceremonial sites, sacred areas, mineral procurement areas, camp sites, and other areas associated with the ancestral Jemez. The ancestral Jemez population in the western homeland has ranged from about 10,000 to 15,000 during the prehistoric period and from 7,000 to 10,000 during the Spanish colonial period.

The ancestral Jemez maintained an extensive network of agriculture and farming practices in the Valles Caldera and Jemez Mountains. The Valles Caldera contains many important sacred areas and religious sites of the traditional ancestral Jemez culture and the area is greatly valued by the Jemez Pueblo as a spiritual sanctuary. The ceremonial sites and gathering areas are still actively used by the Jemez Pueblo today and are crucial to the continuing survival of traditional Jemez Pueblo culture and religion. Ancient religious pilgrimage trails link Walatowa to sites within the Valles Caldera, including Redondo Peak and sacred springs, and the Jemez Pueblo members continue to make religious pilgrimages to these sites to leave prayer offerings and conduct rituals. The Jemez Pueblo hunt societies make lengthy visits to the Valles Caldera to hunt and conduct religious ceremonies and initiations of new members. Moreover, the mineral and hot springs within the Valles Caldera are used by the Jemez Pueblo's medical societies for healing.

The Jemez continue to rely on the Valles Caldera for many critical resources, as they have done for more than 800 years, including the land and water for livestock; plants and animals on the land for subsistence living; timber for

-8-

construction and firewood; mountain and forest shelter from the elements; plants, herbs, and roots for medicine; aspen and willow for drums and ritual objects; oak, cherry, and mahogany for bows and ritual objects; rosewood, plums, and reeds for arrows; obsidian and chert for stone tools; minerals for paint and pigments; spring water and evergreens for ceremonial rites; large and small game for ceremonial use; and feathers for ceremonial use and for arrows. The Jemez Pueblo alleges that by this native occupancy and use it has established aboriginal title to the lands at issue in the Valles Caldera National Preserve.

The Jemez Pueblo acknowledges that Congress enacted legislation in 1860 authorizing the Baca heirs to select up to five square tracts of vacant land totaling up to 496,447 acres anywhere within the Territory of New Mexico in order to settle a Mexican land grant dispute with the town of Las Vegas. An Act to confirm Private Land Claims in the Territory of New Mexico of June 21, 1860, Pub. L. No. 36-197, 12 Stat. 71 (1860 Act). The Baca heirs' first selection, Baca Location No. 1, included approximately 99,289 acres of land in and adjacent to the Valles Caldera, which was subsequently confirmed by both the Surveyor General's Office and the federal land department without notice to the Jemez Pueblo. Aplt. App. at 17.

Notwithstanding a determination by the Surveyor General of New Mexico that the land was "vacant," the Jemez Pueblo alleges the lands included in the Baca Location No. 1 were "exclusively possessed, used and occupied by Jemez

Pueblo pursuant to the Pueblo's aboriginal Indian title," *id.* at 18 ¶ 82, and that the

"Baca heirs received these lands subject to the continuing aboriginal Indian title of

Jemez Pueblo," *id.* at 18 ¶ 83. Moreover, the Jemez Pueblo alleges that it

continued to use and occupy the Valles Caldera for traditional purposes without

any opposition or interference from the Baca family.

In 2000, pursuant to the Valles Caldera Preservation Act of 2000

(Preservation Act), Pub. L. No. 106-248, § 102, 114 Stat. 598, codified at 16

U.S.C. §§ 698v to 698v-10,[7] the United States purchased the property interests of

the Baca heirs' successors in interest – the Dunnigan family – in approximately

94,761 acres of the land in the Baca Location No. 1 in order to establish the Valles

Caldera National Preserve. The Jemez Pueblo alleges that the United States

purchased this property interest subject to its continuing aboriginal Indian title,

and that shortly thereafter the government began limiting the Jemez Pueblo's

access to the land.

**B. Procedural History**

The Jemez Pueblo filed suit under the QTA, 28 U.S.C. § 2409a, to quiet title

to its interest in the lands of the Valles Caldera National Preserve. The

government filed a motion to dismiss, essentially arguing the district court lacked

_____

[7] The Preservation Act has been repealed and replaced by the National Defense Authorization Act of 2015, Pub. L. No. 113-291, § 3043, 128 Stat. 3292, 3798.

subject matter jurisdiction because the Jemez Pueblo's claim accrued prior to 1946 and was therefore barred by the ICCA's five year statute of limitations. In response, the Jemez Pueblo contended that its aboriginal title was not extinguished by the Baca grant, and that its quiet title claim arose only when the United States began to interfere with and limit its use of the land in 2000. Accordingly, it contended, the QTA is applicable and the district court has jurisdiction to hear the case.

The district court granted the government's motion to dismiss, relying primarily on *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987), to conclude that it lacked subject matter jurisdiction. Specifically, it held the Jemez Pueblo had a claim against the United States that accrued as a matter of law before 1946, and therefore its sole remedy was to have brought an action before the ICC before the claim became barred by the statute of limitations. It further concluded that the Jemez Pueblo was required by § 22 of the ICCA to litigate this claim in its prior ICC proceedings when it sought compensation and received money for a taking and extinguishment of aboriginal title to other Jemez lands.[8] Accordingly, the district court held the Jemez Pueblo's QTA action was barred by sovereign immunity.

---

[8] *See Pueblo of Zia v. United States*, 474 F.2d 639, 641 (Ct. Cl. 1973) (*Zia IV*); *see also Pueblo of Zia, et al v. United States (Zia I)*, 11 Ind. Cl. Comm. 131 (1962); *Pueblo of Zia v. United States*, 165 Ct. Cl. 501 (1964) (*Zia II*); *Pueblo of Zia v. United States*, 19 Ind. Cl. Comm. 56 (1968) (*Zia III*).

-11-

**C. Arguments on appeal**

The Jemez Pueblo contends it continues to hold aboriginal title to the land within the Valles Caldera National Preserve, which includes the Baca Location No. 1, because neither the land transfer to the Baca heirs in 1860 nor the United States' purchase of the land in 2000 extinguished its aboriginal title. The district court therefore erred in concluding the ICCA barred its claim and in failing to exercise jurisdiction over the claim under the QTA's sovereign immunity waiver. The government responds that the district court correctly held pursuant to Rule 12(b)(1) that it lacks subject matter jurisdiction under the QTA because the Jemez Pueblo's claim is barred by §§ 12 and 22 of the ICCA and is foreclosed by our decision in *Navajo*, 809 F.2d 1455. The government argues alternatively that the Complaint fails to state a claim under Rule 12(b)(6).

## II

### STANDARD OF REVIEW AND THE ICCA

Federal Rules of Civil Procedure 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction. If the district court did so without taking evidence, as the court did here, our review is de novo. *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944, 946 (10th Cir. 2014).

"'Federal courts are courts of limited jurisdiction,' possessing 'only that

power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). To be sure, "[f]ederal subject matter jurisdiction is elemental . . . and its presence must be established in every cause under review in the federal courts." *Firstenberg v. City of Santa Fe, N.M.*, 696 F.3d 1018, 1022 (10th Cir. 2012). "Indeed, '[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.'" *Becker*, 770 F.3d at 947 (quoting *Kokkonen*, 511 U.S. at 377); *see also Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) ("If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence."). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013).

The district court ruled that sovereign immunity barred the Jemez Pueblo's claim. "The concept of sovereign immunity means that the United States cannot be sued without its consent." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992). "The defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable." *Normandy Apartments, Ltd. v. United States Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009). Thus, "[b]ecause general

-13-

jurisdictional statutes, such as 28 U.S.C. § 1331, do not waive the Government's sovereign immunity, a party seeking to assert a claim against the government under such a statute must also point to a specific waiver of immunity in order to establish jurisdiction." *Id.* Consequently, the Jemez Pueblo may not "proceed without establishing that the United States has agreed to answer to [its] claims in court." *See Sydnes v. United States*, 523 F.3d 1179, 1182-83 (10th Cir. 2008).

The Jemez Pueblo contends the United States has waived sovereign immunity in this case under the QTA, 28 U.S.C. § 2409a, which provides in relevant part: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." The QTA contains a twelve year statute of limitations in which a party other than a state is barred from filing suit unless "it is commenced within twelve years of the date upon which it accrued." § 2409a(g). An action under the QTA accrues when the party "knew or should have known of the claim of the United States." *Id.* It is undisputed, and the government concedes, that the Jemez Pueblo filed this quiet title action within twelve years of when, according to the Pueblo, the claim accrued. That is, the Jemez Pueblo contends its claim accrued only when the United States acquired an interest in the Valles Caldera in 2000 and began limiting the Jemez Pueblo's access to the land in a manner inconsistent with its aboriginal title. The government counters that the ICCA is a jurisdictional bar to the Jemez Pueblo's claim because the Jemez Pueblo

-14-

had a pre-1946 claim against the United States regarding its aboriginal title to this land, which became barred when it failed to file suit within the five year statute of limitation period.

Until Congress enacted the ICCA in 1946, Pub. L. No. 79-726, 60 Stat. 1049, Indian tribes were not permitted to litigate claims "against the federal government without express congressional authorization." *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States Corps of Eng'rs*, 570 F.3d 327, 331 (D.C. Cir. 2009); *Navajo*, 809 F.2d at 1460. To sue the government, Indian tribes had to petition Congress "for special jurisdictional acts authorizing the [Court of Claims] to hear their grievances against the United States; yet few of them succeeded," and "[f]or those who did succeed, the process was costly, burdensome, and time-consuming." *Navajo*, 809 F.2d at 1460.

As a result, Congress enacted the ICCA in 1946, which created the Indian Claims Commission, "a quasi-judicial body to hear and determine all tribal claims against the United States that accrued before August 13, 1946."[9] *Id.*; ICCA § 2, 60 Stat. 1050. The ICCA imposed a five year statute of limitations period "on Indian claims in law and equity then existing and arising under the Constitution, federal law, and treaties between Indian tribes and the United States." *Oglala Sioux*

---

[9] While the Court of Claims was initially established in 1863 to hear claims against the United States, Act of March 3, 1863, ch. 92, § 9, 12 Stat. 757, 767, its jurisdiction included only Indian claims based on treaty. Sovereign immunity barred non-treaty claims.

*Tribe*, 570 F.3d at 331; ICCA § 12. "Congress deliberately used broad terminology in the Act in order to permit tribes to bring all potential historical claims and to thereby prevent them from returning to Congress to lobby for further redress." *Oglala Sioux Tribe*, 570 F.3d at 331. But the ICCA only "bars claims involving allotments or other property, claims involving title, claims to equitable relief, claims for damages, and related constitutional and procedural claims *that accrued before 1946 and were not brought by August 13, 1951*." *Id.* at 331-32. (emphasis added).

Before turning to the applicable legal standards and addressing the parties' arguments, an explanation of the history and legal concepts that govern aboriginal title and Indian land is necessary to understand the nature of the claims and to place in proper perspective the contested historical facts advanced by the parties. This history includes Supreme Court decisions and several 19th and 20th century developments between Spain, Mexico, and the United States.

## III

### THE HISTORY OF INDIAN LAW AND ABORIGINAL TITLE

The problem of recognizing possessory rights claimed by Indians has engaged the attention of jurists since European settlement of the Americas. In fact, the decisions concerning Indian law and aboriginal title cannot be understood without recognizing that the "dealings between the Federal Government and the

Indian Tribes have regularly been handled as part of our international relations." Cohen, *supra* at 43. The main concepts of aboriginal title can be traced back to "Spanish origins, and particularly to doctrines developed by Francisco de Victoria, the real founder of modern international law." *Id.* at 44. The doctrine of Victoria essentially proposed that discovery of new lands gave "title to lands not already possessed," but because the "Indians were true owners, both from the public and the private standpoint, the discovery of them by the Spanish had no more effect on their property than the discovery of the Spaniards by the Indians had on Spanish property." *Id.* at 45.

Pope Paul III provided support for the doctrine of Victoria in 1537 when he said that "Indians are truly men" and that "Indians and all other people who may later be discovered by Christians, are by no means to be deprived of their liberty or the possession of their property." *Id.* (internal quotation marks omitted). This declaration of human rights was affirmed by the United States in the Northwest Ordinance of July 13, 1787, "the first important law of the United States on Indian relations, . . . adopted two years before the Federal Constitution." *Id.* The Northwest Ordinance declared our national policy towards Indians, stating:

> The utmost good faith shall always be observed towards the Indians; their land and property shall never be taken from them without their consent; and in their property, rights and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs being done to them, and for preserving peace and friendship with them.

-17-

*Id.* at 41.

Just as the doctrine of respect for Indian possession first proposed by Victoria "became the guiding principle of Spain's Laws of the Indies," so too would the "promise of the Northwest Ordinance" become "the guiding principle of our Federal Indian Law." *Id.* at 45. Yet, before the Supreme Court's first important case concerning aboriginal title was decided, *see Johnson v. M'Intosh*, 21 U.S. 543 (1823), several historical events between Spain and Mexico took place that would impact the relationship between the pueblos and the United States Government.

## A. Spain and Mexican Independence (1821)

In 1821, the Mexican revolutionary government adopted the Plan of Iguala, a revolutionary proclamation, in the final stage of the Mexican War of Independence from Spain. It declared that "[a]ll inhabitants of New Spain, without any distinction between Europeans, Africans, or Indians, are citizens of this Monarchy . . . and that the person and property of every citizen will be respected and protected by the government." *United States v. Ritchie*, 58 U.S. 525, 538 (1854) (quoting Plan of Iguala) (internal quotation marks omitted); *see also* Susan Scafidi, *Native Americans and Civic Identity in Alta California*, 75 N.D. L. Rev. 423, 432 (1999).

The Treaty of Cordova between Spain and Mexico, ratified on August 24, 1821, adopted the principles set forth in the Plan of Iguala and established

Mexican Independence. *See Ritchie*, 58 U.S. at 538; Placido Gomez, *The History and Adjudication of the Common Lands of Spanish and Mexican Land Grants*, 25 Nat. Resources J. 1039, 1059 (1985). Specifically, sections six, seven, and twelve created a provisional government which was to govern according to existing laws, so long as they were not contrary to the Plan of Iguala. *See Ritchie*, 58 U.S. at 538; *Zia I*, 11 Ind. Cl. Comm. at 133. The Mexican declaration of independence, issued on September 28, 1821, reaffirmed the principles of the Plan of Iguala. *Zia I*, 11 Ind. Cl. Comm. at 133. Three laws passed by the first Mexican congress in 1822 and 1823 also reaffirmed the principles of the Plan of Iguala, including independence, the Catholic religion, and equality of all Mexicans regardless of race. *Ritchie*, 58 U.S. at 538-39.

**B. Aboriginal Title and the Sovereign (1823)**

In *Johnson v. M'Intosh*, 21 U.S. at 572, the Supreme Court first addressed Indian aboriginal right of occupancy and possession as against the sovereign. Plaintiffs in *Johnson* claimed land under a grant by the chiefs of the Illinois and Plankenshaw Nations, forcing the Court to ask "whether this title can be recognised in the Courts of the United States?" *Id.* In holding "that a private land sale of Indian land not consented to by the sovereign gave the purchaser no valid title against the sovereign," Cohen, *supra* at 47, the Court explained the possessory right of occupancy held by the Indians:

> [T]he rights of the original inhabitants were, in no instance, entirely

disregarded; but were necessarily, to a considerable extent, impaired. [Indians] were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it.

*Johnson*, 21 U.S. at 574.

Thus, although "the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives." *Id.* In other words, although the Indians had rights to the lands, fee title to the land resided in the sovereign. Most significantly for our purposes, however, is the Court's holding that "[t]hese grants [by the sovereign] have been understood by all, to convey a title to the grantees, *subject only to the Indian right of occupancy*." *Id.* (emphasis added). What that meant was clarified by later cases.

**C. Aboriginal Title Against States and Colonies (1832)**

Likely the second most important case in the development of Indian law is Chief Justice Marshall's opinion in *Worcester v. Georgia*, 31 U.S. 515 (1832), where the land at issue was in the possession of the Cherokee Indians. Recognizing the sovereignty of the Cherokee Nation and its relationship with the United States established through treaties, the Court held that Georgia could not

exercise jurisdiction over activities occurring on Indian land. *Id.* at 561. In so

doing, the Court made clear that the idea of sovereign discovery and all that it

entailed was not inconsistent with aboriginal title. The Court explained the

sovereign right of discovery as follows:

> *This principle*, acknowledged by all Europeans, because it was the
> interest of all to acknowledge it, *gave to the nation making the
> discovery*, as its inevitable consequence, *the sole right of acquiring
> the soil and making settlements out of it.* It was an exclusive
> principle which shut out the right of competition among those who
> had agreed to it; not one which could annul the previous rights of
> those who had not agreed to it. It regulated the right given by
> discovery among the European discoverers; *but could not affect the
> rights of those already in possession, either as aboriginal occupants,
> or as occupants by virtue of a discovery made before the memory of
> man.*

*Worcester*, 31 U.S. at 544 (emphasis added).

The Court in *Worcester* explained that Georgia was chartered by Britain to

enable its subjects to settle there but that the charter did not purport to grant title

to the land in possession of the natives. *Id.* at 544-56.

> The general views of Great Britain, with regard to the Indians were
> detailed by Mr. Stuart, superintendent of Indian affairs in a speech
> delivered at Mobile, in presence of several persons of distinction,
> soon after the peace of 1763. Towards the conclusion he says, 'lastly,
> I inform you that it is the king's order to all his governors and
> subjects, to treat Indians with justice and humanity, and to forbear all
> encroachments on the territories allotted to them.

*Id.* at 544-46. *Worcester* thus clarified the proposition suggested in *Johnson v.*

*M'Intosh* that a grant to third parties by the sovereign of land in possession of the

Indians and which they presently occupied did not extinguish their aboriginal title.

-21-

*Cohen*, *supra* at 49-50.

**D. The Scope and Transferability of Aboriginal Title (1835)**

In *Mitchel v. United States*, 34 U.S. 711, 716 (1835), the Court addressed an issue relating to land in Florida granted to private parties by Creek and Seminole Indians in 1804 and 1806. The private individuals claimed their title under deeds from the Indians that had been confirmed by Spain prior to Spain ceding Florida to the United States by treaty. In explaining "the nature and extent of Indian title to [the] lands," *id.* at 745, the Court set forth how those rights were viewed by the British, who had governed Florida for twenty years from 1763 to 1783:

> One uniform rule seems to have prevailed from their first settlement, as appears by their laws; that friendly Indians were protected in the possession of the lands they occupied, and were considered as owning them by a perpetual right of possession in the tribe or nation inhabiting them, as their common property, from generation to generation, as the right of individuals located on particular spots.
>
> *Subject to this right of possession*, *the ultimate fee was in the crown and its grantees*, which could be granted by the crown or colonial legislatures *while the lands remained in possession of the Indians, though possession could not be taken without their consent*.
>
> . . . .
>
> The merits of this case do not make it necessary to inquire whether the Indians within the United States had any other rights of soil or jurisdiction; *it is enough to consider it as a settled principle, that their right of occupancy is considered as sacred as the fee simple of the whites*.

*Id.* at 745-46 (emphases added). The Indian sale of property in *Mitchel* had occurred with the consent of Spain, the sovereign at the time. "What had been

conceded, by way of dictum, in *Johnson v. M'Intosh*, namely that Indian title included power to transfer as well as to occupy, is the core of the decision in the *Mitchel* case." Cohen, *supra* at 50.

Most importantly for our case, *Mitchel* established a significant point in the doctrine of aboriginal title by expressly rejecting the idea that "possession" extends only to improved lands.

> Indian possession or occupation was considered with reference to their habits and modes of life; *their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way* and from their own purposes *were as much respected*, until they abandoned them, made a cession to the government, or an authorized sale to individuals.

*Mitchel*, 34 U.S. at 745 (emphasis added). *See also* Cohen's Handbook of Federal Indian Laws, § 18.01, at 1154-55 (Nell Jessup Newton ed., 2012) [hereinafter Cohen's Handbook]. This describes the very nature of aboriginal title – that it covers lands used by the Indians in their daily lives as hunters and gatherers as well as lands on which they actually resided.

**E. The Treaty of Guadalupe Hidalgo, February 2, 1848**

As the above cases make clear, the nature of Indian title in the United States was established before the country acquired what would become much of the southwest and west of the United States. In 1848, "[t]he Treaty of Guadalupe Hidalgo ended the war between the United States and Mexico, designated the Rio Grande as the Texas border, reduced the size of Mexico by more than half, and

doubled the territory of the United States, including parts of present-day Arizona, California, New Mexico, Texas, Colorado, Nevada, and Utah." Robert J. McCarthy, *Executive Authority, Adaptive Treaty Interpretation, and the International Boundary and Water Commission, U.S.–Mexico*, U. Denv. Water L. Rev. 197, 209 (2011). In Article VIII of the Treaty, the United States agreed to respect pre-existing property rights of all Mexican citizens, which included the Indians living within the territory covered by the Treaty. Treaty of Guadalupe Hidalgo, U.S.-Mex., Feb. 2, 1848, 9 Stat. 922, 928. The government concedes this much in its brief on appeal. Aple. Br. at 7-8. Read together with section twelve and thirteen of the Plan of Iguala, the Treaty of Cordova, the Mexican declaration of Independence, and the several acts of the first Mexican Congress implementing the Plan of Iguala, *supra* at 18-19, Article VIII of the Treaty between Mexico and the United States effectively recognized the then-existing property rights of the pueblo Indians. 9 Stat. at 928. *See* Cohen's Handbook, § 4.0[9], at 311.

**F. Establishment of the office of Surveyor General of New Mexico, . . . and for other purposes, 10 Stat. 308 (July 22, 1854)**

In 1854, Congress established the office of the Surveyor General for New Mexico and ordered him "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico;" and to make a full report on the validity of the claims that "originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo,

. . . denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States." § 8, 10 Stat. at 309. Further, the Surveyor General was tasked with making "a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land." *Id.* The Jemez Pueblo acknowledges this in its Complaint.

## G. An Act to confirm certain Private Land Claims in the Territory of New Mexico, 12 Stat. 71 (June 21, 1860)

The 1860 Act is the precursor to the establishment of Baca Location No. 1, the Baca ranch, which was created on lands the Jemez Pueblo claims in this case as part of its aboriginal land. In this Act, Congress settled a Mexican land grant dispute between the town of Las Vegas and the Baca heirs by allowing the town to retain title over the contested land and authorizing the Baca heirs "to select instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in Square bodies, not exceeding five in number." *Id.* § 6, 12 Stat. at 72. Section 6 further stated that "it shall be the duty of the Surveyor General of New Mexico, to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them; *Provided, however*, That the right hereby granted to said heirs of Baca shall continue in force during three years from the passage of this act, and no longer."

-25-

The Supreme Court explained in *Shaw v. Kellogg*, 170 U.S. 312 (1898), how the Baca heirs gained title to one of the parcels of land they were authorized by the 1860 Act to select:

> Congress, in 1860, made a grant of a certain number of acres, authorized the grantees to select the land within three years anywhere in the territory of New Mexico, directed the surveyor general of that territory to make survey and location of the land selected, thus casting upon that officer the primary duty of deciding whether the land selected was such as the grantees might select. They selected this track [Baca Location No. 3]. Obeying the statute and the instructions issued by the land department, that officer approved the selection, and made the survey and location. The land department . . . finally directed him to close up the matter, to approve the field notes, survey, and plat, and notified the parties through him that such field notes, survey, and plat, together with the act of congress should constitute the evidence of title. All was done as directed. *Congress made no provision for a patent, and the land department refused to issue one. All having been done that was prescribed by the statute, the title passed.*

*Id.* at 342-43 (emphasis added). Accordingly, once the Surveyor General performed the prescribed duties and the land office approved the selection, title passed to the Baca heirs.[10]

In the 1860 Act, Congress also confirmed, on the recommendation of the Surveyor General, several other private land claims in the Territory of New Mexico arising under the Treaty of Guadalupe Hildago. Notably, the Act declared in section 4 "[t]hat the foregoing confirmation shall only be construed as quit-

---

[10] The Baca heirs gained title to Baca Location No. 1, the land involved in this case, in similar fashion. *See United States v. Redondo Development Co.*, 254 F. 656, 657-58 (8th Cir. 1918).

claims or relinquishments, on the part of the United States, *and shall not affect the adverse rights of any other person or persons whomsover*." 1860 Act, 12 Stat. at 71-72 (emphasis added). The effect of this statute and subsequent actions of the Surveyor General on the Jemez Pueblo's aboriginal title are the central issues in this appeal with respect to whether the Jemez had a pre-1946 claim against the United States.

**H. Aboriginal Title and the Railroads (1886)**

After the 1860 Act, the Court continued to recognize the validity of aboriginal right of occupancy as against grants made by the United States in the absence of explicit extinguishment of Indian title. In *Buttz v. Northern Pacific Railroad*, 119 U.S. 55, 66-73 (1886), the Court applied the rules announced in *Johnson* and *Worcester* to a grant of land for the building of transcontinental railroads that needed access across Indian lands. The railroad claimed title to the land at issue under a grant made by Congress. The Court held that the Indians retained their aboriginal title notwithstanding the grant of fee title to someone else:

> The land in controversy, and other lands in Dakota, through which the Northern Pacific Railroad was to be constructed, was within what is known as Indian Country. *At the time the act of July 2, 1864, was passed, the title of the Indian tribes was not extinguished. But that fact did not prevent the grant of congress from operating to pass the fee of the land to the company. The fee was in the United States. The Indians had merely a right of occupancy, – a right to use the land subject to dominion and contr[o]l of the government. The grant conveyed the fee subject to this right of occupancy. The railroad*

-27-

*company took the property with this incumbrance.* The right of the Indians, it is true, could not be interfered with or determined except by the United States . . . The right of the United States to dispose of the fee of lands occupied by [the Indians] has always been recognized by this court from the foundation of the government.

*Id.* at 66-67 (emphasis added).

*Buttz* stands for the proposition that although grants by the United States of land in possession of the Indians conveys fee title, the grant does not impair aboriginal title, which the grantee must respect until aboriginal title has been extinguished by treaty, agreement, or other authorized actions of the Indians or Congress. Cohen, *supra* at 53. The Indian right of occupancy in 1864 that the Court referenced in *Buttz* had not been defined by treaty between the Indians and the United States. It was instead aboriginal land previously unrecognized by the United States.[11]

Following *Buttz*, the Court in *Cramer v. United States*, 261 U.S. 219, 224-25, 230 (1923), continued to protect and respect aboriginal title, holding that it was excluded from the grant in question. There the Act of July 25, 1866, 14 Stat. 239, "granted to the predecessor of the defendant company a series of odd-numbered sections of land, including those named, but excepted from the grant such lands as shall be found to have been granted, sold, reserved, occupied by

---

[11] The Court would later reaffirm that a tribe's aboriginal title does not require an affirmative act of the sovereign for its continued viability. *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 347 (1941).

homestead settlers, pre-empted or otherwise disposed of." *Cramer*, 261 U.S. at 225 (internal quotation marks omitted). The question in *Cramer* concerned a land patent issued in 1904 by the United States to Central Pacific Railway, which included land covered by the 1866 Act. *Id.* at 224-35. In issuing the patent in 1904, the Department of Interior had assumed there was no reservation or other encumbrance that would prevent passing full and clear title to the grantee. Cohen, *supra* at 29. Cramer, the railroad's assignee, contended the Department of the Interior had determined that the Indians had no rights to the land, and that the railroad had free and clear title and had leased the land from Cramer. *Id.* at 31.

The Court rejected this argument, noting that the departmental action which had disregarded aboriginal rights was unfounded: "The fact that such right of [Indian] occupancy finds no recognition in any statute or other formal governmental action is not conclusive. The right, under the circumstances here disclosed, flows from settled governmental policy." *Cramer*, 261 U.S. at 229. That policy, the Court explained, "to respect the Indian right of occupancy, which could only be interfered with or determined by the United States," had "unquestionably" been the federal government's policy "from the beginning." *Id.* at 227. Read together, *Buttz* and *Cramer* stand for the proposition that aboriginal title is not extinguished by a railroad grant, surviving as either an encumbrance upon or an exception carved out of the grant.

**I. Pueblo Land as Indian Country**

In 1913, the Supreme Court in *United States v. Sandoval*, 231 U.S. 29 (1913), emphasized that the lands of the pueblos in New Mexico had long been considered by the United States Congress as Indian Country, subject to the special protection of the government.

> [I]t is not necessary to dwell specially upon the legal status of this people under either Spanish or Mexican rule, for whether Indian communities within the limits of the United States may be subjected to its guardianship and protection as dependent wards turns upon other considerations. Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state.

*Id.* at 45-45 (citation omitted).

**J. Aboriginal Title and Administrative Officials (1941)**

In *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. at 343-44, the United States, as guardians of the Walapai Tribe, brought suit to enjoin the railroad from interfering with the possession and occupancy of the Indians of a piece of land granted to the railroad's predecessor by the Act of July 27, 1866, 14 Stat. 292. The land in question included lands both inside and outside the Walapai reservation, established by the President's Executive Order of January 4, 1883. *Id.* The railroad argued it had full title to the lands in question under the grant of land

provided for by the 1866 Act. *Id.* at 343. Section 2 of the Act stated: "The United

States shall extinguish, as rapidly as may be consistent with public policy and the

welfare of the Indians, and only by their voluntary cession, the Indian title to all

lands falling under the operation of this act and acquired in the donation to the

road named in the act." *Id.* at 344.

The Court held that if the "lands in question were the ancestral home of the

Walapais," such that "occupancy constituted 'Indian title' within the meaning of

s[ection] 2 of the 1866 Act, which the United States agreed to extinguish" only by

the Indians "voluntary cession," then in the "absence of such extinguishment the

grant to the railroad 'conveyed the fee subject to this right of occupancy.'" *Id.* at

344-45 (quoting *Buttz*, 119 U.S. at 66). The Court reasoned:

> Unquestionably it has been the policy of the federal government from
> the beginning to respect the Indian right of occupancy, which could
> be interfered with or determined by the United States. *Cramer v.
> United States*, 261 U.S. 219, 227. This policy was first recognized in
> *Johnson v. M'Intosh*, 8 Wheat. 543; *Mitchel v. United States*, 9 Pet.
> 711; *Chouteau v. Molony*, 16 How. 203; *Holden v. Joy*, 17 Wall. 211;
> *Buttz v. Northern Pacific Railroad*; *United States v. Shoshone Tribe*,
> 304 U.S. 111. *As stated in Mitchel v. United States*, 9 Pet. at 746,
> Indian "right of occupancy is considered as sacred as the fee-simple
> of the whites."* Whatever may have been the rights of the Walapais
> under Spanish law[,] the *Cramer* case assumed that lands within the
> Mexican Cession were not excepted from the policy to respect Indian
> right of occupancy. Though the *Cramer* case involved the problem of
> individual Indian occupancy, this Court stated that such occupancy
> was not to be treated differently from "the original nomadic tribal
> occupancy." 261 U.S. at 227. Perhaps the assumption that aboriginal
> possession would be respected in the Mexican Cession was like the
> generalizations in *Johnson v. M'Intosh*, not necessary for the narrow
> holding of the case. But such generalizations have been so often and

-31-

so long repeated as respects land under the prior sovereignty of the various European nations including Spain, that like other rules governing titles to property, they should now be considered no longer open. Furthermore treaties negotiated with Indian tribes, wholly or partially within the Mexican Cession, for delimitation of their occupancy rights or for the settlement and adjustment of their boundaries, constitute clear recognition that no different policy as respects aboriginal possession obtained in this area than in other areas. *Certainly, it would take plain and unambiguous action to deprive the Walapais of the benefits of that policy.* For it was founded on the desire to maintain just and peaceable relations with Indians. The reasons for its application to other tribes are no less apparent in the case of the Walapais, a savage tribe which in the early days caused the military no end of trouble.

*Id.* at 345-46 (emphases added) (footnotes omitted) (some citations omitted).

The Court went on to discuss whether, in fact, the Walapai's aboriginal title had been extinguished. It made clear that "the exclusive right of the United States to extinguish Indian title has never been doubted," and that aboriginal title may be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *Id.* at 347 (internal quotation marks omitted). The Court explained why several different acts of Congress and the creation of the Colorado River reservation *had not extinguished aboriginal title* – namely, because the Court found no clear or plain indication that Congress intended by those acts to extinguish aboriginal title. *Id.* at 347-356. Notably, the Court said of the Surveyor General Act of 1854:

[It] merely called for a report to Congress on certain land claims. If there was an extinguishment of the rights of the Walapais, it resulted not from the action of the Surveyor General but from the action of Congress based on his reports. We are not advised that Congress took

-32-

any such action.

*Id.* at 351.

Ultimately, the Court held that the Walapai Indian Reservation established by the President's Executive Order in 1883 at the Walapai's request had extinguished the Tribe's aboriginal title because "its creation at the request of the Walapais and its acceptance by them amounted to a relinquishment of any tribal claims to lands which they might have had outside that reservation and that that relinquishment was tantamount to an extinguishment by 'voluntary cession' within the meaning of s[ection] 2 of the Act of July 27, 1866." *Id.* at 357-58 (footnote omitted).

While *Sante Fe* is important in the development of Indian law because it reaffirmed principles first established in *Johnson v. M'Intosh*, reaffirmed that aboriginal title is not determined by treaty, and applied the doctrine of aboriginal title to the Mexican cession area, it is more important for yet another reason that is directly relevant to the case before us. That is, the Court held that aboriginal possession and occupancy of an Indian tribe "survived a course of congressional legislation and administrative action that had proceeded on the assumption that the area in question was unencumbered public land." Cohen, *supra* at 56. Accordingly, "the decision stands as a warning to purchasers of real property from the Federal Government, reminding them that not even the Government can give what it does not possess." *Id.*

In light of this historical background, we turn to the issues on appeal.

# IV

## DISCUSSION

### A. Subject Matter Jurisdiction

This appeal raises two specific issues we must address for purposes of our review of the district court's dismissal of the action for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). The central issue is whether the Jemez Pueblo had a claim against the United States which, as a matter of law, accrued before August 13, 1946.[12] If it did, then the district court was correct in holding the claim barred

---

[12] The ICCA defined claims as follows:

> Sec. 2. The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such

(continued...)

by ICCA § 12 and concluding that it lacked subject matter jurisdiction. If we cannot determine as a matter of law that there was a pre-1946 claim against the government, then the claim is not facially barred by § 12 of the ICCA.[13] In that event, we must determine alternatively whether compensation paid to the Jemez Pueblo in prior litigation before the ICC forecloses this claim under the ICCA § 22.

The government first argues that the Baca grant made pursuant to the 1860 Act extinguished, or was at least inconsistent with, the Jemez Pueblo's aboriginal title such that a claim against the United States arose before 1946. It contends the Surveyor General's conclusion that the lands were "vacant" when it approved the Baca grant was "sufficiently inconsistent with the Jemez Pueblo's claim to aboriginal title for a cause of action to accrue for the purposes of the ICCA." Aple. Br. at 25. The government relies primarily on *Navajo*, 809 F.2d 1455, in maintaining that the Jemez Pueblo's claim is time barred by ICCA § 12.

---

[12](...continued)
>  lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

[13] Section 12 of the ICCA provides in full:
>  The Commission shall receive claims for a period of five years after the date of the approval of this Act and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by Congress.

We first note that "the rule of construction recognized without exception for over a century has been" that if there is doubt whether aboriginal title has been validly extinguished by the United States, any "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of" the Indians. *Santa Fe*, 314 U.S. at 354 (internal quotation marks omitted). It is against this backdrop and the history of Indian law we have set out above that we address the government's arguments.

### 1. 1860 Baca grant and our decision in Navajo

The government's arguments ignore the nature of aboriginal title and the last 200 years of Supreme Court jurisprudence. The Court has repeatedly held the Indian "right of occupancy is considered as sacred as the fee-simple of the whites," *Santa Fe*, 314 U.S. at 345 (quoting *Mitchel*, 34 U.S. at 716), and that this right of occupancy may only be extinguished by Congress's "plain and unambiguous" intent, which will not be "lightly implied," *id.* at 346, 354. As far back as *Johnson v. M'Intosh*, the Court held that although the sovereign has the power to grant to third parties fee title to lands occupied by Indians, "[t]hese grants have been understood by all, to convey a title to the grantees, *subject* only *to the Indian right of occupancy*." 21 U.S. at 574 (emphasis added).

This concept, that federal land grants pass fee title to the grantees subject to aboriginal title, has repeatedly been upheld by the Supreme Court. In *Oneida Indian Nation v. County of Oneida*, the Court explained:

It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable by the United States.

414 U.S. 661, 667 (1974); s*ee also Buttz*, 119 U.S. at 66-67 ("The grant conveyed the fee subject to this right of occupancy. The railroad company took the property with this [e]ncumbrance."); *Cramer*, 261 U.S. at 229 (grant to railroad did not extinguish aboriginal title); *Santa Fe*, 314 U.S. at 345 (citing cases). As the Court pointed out in *Santa Fe*, 314 U.S. at 345, these rules governing aboriginal title have been upheld and reaffirmed for so long that "they should now be considered no longer open." Moreover,

[t]he Santa Fe case also reaffirmed prior decisions to the effect that a tribal right of occupancy, to be protected, need not be based upon a treaty, statute, or other formal government action. Tribal rights were nevertheless entitled to the protection of federal law, and with respect to Indian title based on aboriginal possession, the power of Congress is supreme.

*Oneida*, 414 U.S. at 669 (internal quotation marks, citations, and ellipsis omitted).

### a. The Baca grant of "vacant" land

Absent clear and unambiguous intent by Congress to allow extinguishment of the aboriginal right of occupancy of the Jemez Pueblo, therefore, the grant of

-37-

land to the Baca heirs was valid to convey the fee but the Baca heirs took the title subject to the Jemez Pueblo's aboriginal title.[14] The government cites us to no language in the 1860 Act to show the unambiguous intent of Congress to extinguish existing Indian title.

The government instead argues that a claim accrued to the Jemez Pueblo in 1860 when the Surveyor General concluded the lands at issue were "vacant." It asserts that this finding is "flatly inconsistent" with the Jemez Pueblo's contention that it "had actual, exclusive, and continuous use and occupancy of those lands." Aple. Br. at 26 (internal quotation marks omitted). First, this conflates the factual merits question of establishing aboriginal possession with the jurisdictional question on appeal of when a claim actually accrued. *See, e.g.*, *Santa Fe*, 314 U.S. at 345, 359 ("[O]ccupancy necessary to establish aboriginal possession is a

---

[14] The government cites *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 646 (9th Cir. 1986), for the proposition that a tribe "claiming a right of occupancy based on aboriginal title . . . lost all rights in the land when they failed to present a claim to the commissioners." Aple. Br. at 28 (quoting *Chunie*, 788 F.2d at 646). But that case involved an 1851 Act which established a commission to settle land claims only in California and required "every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government to present his or her claim to the commissioners within two years." *Chunie*, 788 F.2d at 644. That case is inapplicable to the Pueblo Jemez. *See Santa Fe*, 314 US. at 349-51 (distinguishing 1854 Surveyor General Act from 1851 Act settling California land claims, and pointing out the latter statute required claims to be presented to commissioners within two years to avoid extinguishment while the 1854 Act "merely called for a report to Congress"). Moreover, the Ninth Circuit stated in *Chunie* that "[a] grant of Indian-occupied land by the government to an individual does not . . . constitute extinguishment." *Chunie*, 788 F.2d at 642.

question of fact.").  As we have pointed out, Supreme Court decisions since 1823 make clear that the Baca grant at issue was subject to the Jemez Pueblo's aboriginal title – assuming the Jemez maintained aboriginal possession at the time.[15]

Second, the conclusion of the Surveyor General of New Mexico that the lands at issue were vacant and thus could be transferred to the Baca heirs did not by itself serve to extinguish existing aboriginal title.  The decisions in *Santa Fe*, 314 U.S. 339, and *Cramer*, 261 U.S. 219, are particularly instructive on this point. In *Santa Fe*, the Court made clear that the Act of July 22, 1854, 10 Stat. 308, which established the office of the Surveyor General of New Mexico, did not institute "a policy of non-recognition of Indian title," and it was not persuaded "that it effected any extinguishment of that title."  *Santa Fe*, 314 U.S. at 348; *see also United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1387-88 (Ct. Cl. 1975) (statute creating Surveyor General and subsequent Act to confirm bona fide grants of prior sovereigns to pueblos did not extinguish aboriginal title to lands not included in the congressional confirmations); *Pueblo of Zia v. United States*, 19 Ind. Cl. Comm. 56, 70 (1968) (*Zia III*) (clear that purpose of Surveyor General Act was to recommend how laws of Spain and Mexico affected claims to land "rather than to recommend any action by Congress which would affect Indian title to lands

---

[15] We express no opinion on whether, on remand, the Jemez Pueblo can factually establish aboriginal possession to the land it claims.

based on aboriginal occupancy."). The Court in *Santa Fe* held "[i]f there was any extinguishment on the rights of the Walapais, it resulted not from action of the Surveyor General but from action of Congress based on his reports," stating "[w]e are not advised that Congress took any such action." *Santa Fe*, 314 U.S. at 351. Similarly, nothing cited in the present case suggests that Congress took any action to extinguish aboriginal title after it authorized the Baca heirs to select substitute land.

Likewise, in *Cramer*, 261 U.S. 219, the Department of the Interior had issued patents to the Central Pacific Railway Company based on the assumption that the land contained no encumbrance or reservation preventing the passage of full title. Cohen, *supra* at 29-31. Yet, the Supreme Court held that "[s]ince these Indians with the implied consent of the government had acquired such rights of occupancy as entitled them to retain possession as against the defendants, no officer or agent of the government had authority to deal with the land upon any other theory." *Cramer*, 261 U.S. at 234. The Court added that the "acceptance of leases for the land from the defendant company by agents of the government was, under the circumstances, unauthorized and could not bind the government; much less could it deprive the Indians of their rights." *Id.* It therefore makes no difference that the Surveyor General believed the land selected by the Baca heirs was vacant. He had no authority to extinguish the Jemez Pueblo's aboriginal title.

The government responds that the Act of 1860, 12 Stat. 71, 72, intended the

transfer of the land to the Baca heirs to be absolute and without condition because

it contained no language that the grant "was subject to pre-existing interests," such

as the Jemez Pueblo's aboriginal title. Aple. Br. at 27. This argument again

ignores longstanding Supreme Court precedent that the grant passed subject to the

Indian's right of occupancy absent express extinguishment. *Santa Fe*, 314 U.S. at

345; *Buttz*, 119 U.S. at 66-67; *Cramer*, 261 U.S. at 229; *Johnson v. M'Intosh*, 21

U.S. at 574. Notably, the Court has never held that a grant needs to contain

specific language stating the land remains subject to aboriginal title. On the

contrary, language was required in the grant to clearly show Congress's intent to

extinguish aboriginal title, and we can discern no such language or intent in the

1860 Act.[16] Accordingly, the Baca heirs were granted fee title subject to any pre-

---

[16] The government cites *Shaw v. Kellogg*, 170 U.S. 312, 343 (1898), and *Lane v. Watts*, 234 U.S. 525 (1914), in arguing that the grant to the Baca heirs passed free and clear title that could not thereafter be challenged. Both cases involved other Baca grants and are otherwise inapposite, primarily because the disputes there were between two non-Indians and had nothing to do with aboriginal occupancy rights. *Shaw* involved an action for ejectment of a tenant who refused to leave the land and contended that the grant of Baca Location No. 4 pertained to non-mineral land, that the tract of land at issue was mineral, and therefore by the terms of the 1860 Act the land was not within the grant. *See* 170 U.S. at 330. The case concerned mineral rights and the passage the government cites in which the Court stated that "the title of the locators and their grantees is not subject to challenge, and that it is full, absolute, and unconditional title" concerned the fee title to lands as between two private non-Indian individuals. *Id.* at 343.

    *Lane* involved Baca Float No. 3 and nothing in the opinion pertained to aboriginal title or extinguishment of aboriginal title. *See* 234 U.S. at 526. The Court applied *Shaw* in holding that title had properly passed from the United

(continued...)

existing aboriginal occupancy rights of the Jemez Pueblo.[17]

### b.  *Baca use of land as a cloud on aboriginal title*

The government counters that even if aboriginal title was not extinguished, the grant at least placed a cloud on the Jemez Pueblo's aboriginal title such that a claim accrued against the United States in 1860.  The government asserts that the Baca's use of the land is inconsistent with the Pueblo's aboriginal title.

But simultaneous occupancy and use of land pursuant to fee title and aboriginal title could occur because the nature of Indian occupancy differed significantly from the occupancy of settlers:

> Indian possession or occupation was considered with reference to their habits and modes of life; their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way and for their own purposes were as much respected.

*Mitchel*, 34 U.S. at 746.  For this reason, the terms "aboriginal use and occupancy" have been defined "to mean use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers."  *Sac & Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967).

---

[16](...continued)
States to the Baca heirs.  The point of the case was that the grant could not be "subsequently divested by the officers of the Land Department."  *Id.* at 540.

[17] Interestingly, the deed given to the United States in 2000 by the successors in interest to Baca Location No. 1 warranted the title to be free from all prior encumbrances, "EXCEPT (1) any claims of and demands of any Indian nation, tribe or pueblo."  Aplt. App. at 21.

One must remember that much of the land involved here is remote. As described by the court in *United States v. Redondo*, 254 F. at 657, "[t]he lands in the [Baca No. 1] location and the surrounding country were wild, mountainous, and principally in forest, unsettled in 1860 and ever since."[18] In these circumstances, it is easy to see how the Surveyor General may have mistakenly believed the lands were vacant even if they were being used by the Jemez for hunting, fishing, and other such activities. Similarly, it is also easy to see how a peaceful and private Indian pueblo might have used portions of this large area of land for its traditional purposes while one agreeable rancher was using portions of it for grazing livestock. The Complaint so alleges.

Whether the Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860 and thereafter is a fact question to be established on remand, where it will have the opportunity to present evidence to support its claim. To do so, it must show "'actual, exclusive, and continuous use

---

[18] The aboriginal land of the Taos Pueblo was apparently similar in many respects. After describing the pueblo people's way of life in *Pueblo of Taos v. United States*, 15 Ind. Cl. Comm. 666, 669-78 (1965), the Commission later explained why the pueblo, with a much smaller population, used more land than the Spanish settlers who had moved into part of the pueblo's aboriginal land:

> This surely is not out of line, especially when it is recognized that most of the area claimed by Indian title is mountainous and unfit for farming or sheepherding. The Spanish preferred the bottom lands where they could farm and tend their flocks of sheep and had no real need or desire for the upper mountainous lands which the Taos Indians inhabited.

*Id.* at 698.

-43-

and occupancy 'for a long time' of the claimed area." *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (quoting *Sac & Fox Tribe*, 383 F.2d at 998). The government contends the Jemez Pueblo cannot prove "exclusive" use because the Baca heirs used the land. But the "exclusive" part of the test meant only that in order to establish aboriginal title, a tribe "must show that it used and occupied the land to the *exclusion of other Indian groups*." *Pueblo of San Ildefonso*, 513 F.2d at 1394 (emphasis added); *see also Native Village of Eyak*, 688 F.3d at 624 ("Exclusivity is established when a tribe or a group shows that it used and occupied the land to the *exclusion of other Indian groups*."); *Zuni Tribe of N.M. v. United States*, 12 Cl. Ct. 607, 608-09, 617-20 & nn. 13-15 (1987) (holding Zuni exclusively used and occupied lands where no evidence other tribes used and occupied lands); *Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed. Cir. 1983) ("Clearly, the northern two-thirds of Oklahoma where the Osage also hunted cannot have been used exclusively by the Wichitas. Lands continuously wandered over by adverse tribes cannot be claimed by any one of those tribes."); *Caddo Tribe of Okla. v. United States*, 35 Ind. Cl. Comm. 321, 358-60 (1975) (exclusivity established where Tribe "exercised control over [the claimed area] and over other Indians who may have ventured therein").

To show "actual" and "continuous use," on the other hand, the Jemez Pueblo must show, as it alleges in its Complaint, that the Jemez people have continued for hundreds of years to use the Valles Caldera for traditional purposes, including

-44-

hunting, grazing of livestock, gathering of medicine and of food for subsistence, and the like. As the cases make clear, if there was actually substantial interference by others with these traditional uses before 1946, the Jemez Pueblo will not be able to establish aboriginal title. In that circumstance, moreover, the Pueblo would be barred by the ICCA statute of limitations for failing to bring a claim before the ICC.

The Court of Claims' decision in *Pueblo of San Ildefonso*, 513 F.2d 1393, is illustrative of a situation in which white settlement and use, authorized by the federal government both statutorily and in fact, brought about a pre-1946 claim against the United States for failure to protect aboriginal title of the pueblos. There, three Indian pueblos filed claims with the ICC to recover compensation from the United States for authorizing the gradual taking of their aboriginal use and occupancy of lands in northern New Mexico. *Id.* at 1385-86. The Court of Claims held that Congress did not intend to extinguish aboriginal title by the passage of the Pueblo Land Claims Act itself, *id.* at 1388, but that such extinguishment had been authorized over time by actual conveyances to non-Indians under the public land laws, and by inclusion of pueblo land in the Jemez Forest Reserve and in a grazing district created under the Taylor Grazing Act, *id.* at 1390-92. The court made clear that determining whether and when the United States permitted aboriginal title to be extinguished was a factual question:

The threshold rule, of course, is that termination of Indian title is

exclusively the province of the United States. And in this regard, the 'power of Congress * * * is supreme.' Santa Fe, 314 U.S. at 347. Another familiar principle is that the time fixed for the 'taking' of specific lands depends upon the particular facts, circumstances and history of each case. See [id.] at 357-58. This court was compelled to give emphasis to this rudimentary point in its recent decision in Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 946 (1974), and Gila River Pima-Maricopa Indian Community v. United States, 494 F.2d 1386 (1974).

Id. at 1387 (some citations omitted). After reviewing the history of the three pueblos involved in the case, the court said:

But even if the aboriginal title areas of these pueblos were open to entry, it does not automatically follow that Indian title was destroyed prior to actual entries upon the various tracts of land. We know that the process of surveying lands and performing other deeds in anticipation of future white settlement does not itself affect Indian title. Nor is the bare expectation that lands will be settled sometime in the future sufficient to deprive Indian dwellers of their aboriginal rights. Gila River, 494 F.2d at 1391. Making lands available for white settlement could, of course, in an appropriate factual context, constitute termination of aboriginal ownership. See [id.]. But that result does not obtain in the present case. The opening of lands ceded by Mexico to white settlement was merely an act in recognition of the inevitable western migration and eventual settlement of white homesteaders. This formal acknowledgment that the territory acquired from Mexico would sooner or later be used and occupied by migrating white settlers does not translate into a present intention on the part of Congress to destroy Indian title. Nor does the opening of these lands to settlers under the public land laws signify, as the Government would have it, that Congress intended the 1858 confirmation of the pueblo land grants to effectuate the extinguishment of the Indians' aboriginal ownership rights.

Id. at 1389 (some citations omitted). The court concluded:

[T]here are no fine, spun of precise formulas for determining the end of aboriginal ownership. *Unquestionably, the impact of authorized white settlement upon the Indian way of life in aboriginal areas may*

-46-

> *serve as an important indicator of when aboriginal title was lost. But such authorized settlement is only one of various factors to be considered in determining when specific lands were 'taken.'* Gila River, 494 F.2d at 1391.

*Id.* at 1390 (emphasis added). *See generally Tlingit & Haida Indians of Alaska v. United States*, 177 F. Supp. 452 (Ct. Cl. 1959) (holding evidence established that aboriginal title was taken by government over time); *Pueblo of Nambe v. United States*, 16 Ind. Cl. Comm. 393 (1965) (same); *Pueblo of Taos*, 15 Ind. Cl. Comm. 666 (1965) (same).

The latter three cases cited above were all referred to in *Zia III*, 19 Ind. Cl. Comm. at 74. There, the pueblos in the *Zia* litigation (which included the Jemez Pueblo, *see infra* at 54), asserted that the United States owed them compensation for having extinguished their aboriginal titles as a matter of fact over time by interfering with their native use and occupancy. For example, the Commission in *Zia III* discussed what happened when the Secretary of Interior, pursuant to the Taylor Grazing Act, 48 Stat. 1269, issued his order establishing Grazing District No. 2:

> The effect of this Order was that [the pueblos] were now required to obtain grazing licenses and pay grazing fees for the use of lands which they were still using up to the date of said Order, and had been using for livestock grazing from time immemorial. We find that such action on the part of Congress and the President constitutes a taking of petitioners' Indian title lands under Section 2 of the Indian Claims Commission Act.

*Id.* at 64. Later in the opinion, the Commission explained what happened when the

Jemez Forest Reserve was created within the exterior boundaries of part of the

pueblos' aboriginal land:

> In *Pueblo of Taos v. United States*, 15 Ind. Cl. Comm. 666, 702, we
> said:
>
> > "What these documents[19] establish is that the Pueblo
> > Indians had been left undisturbed in the use of their
> > aboriginal hunting, grazing and gathering lands until the
> > first decade of the 20th century. It was only when the
> > Forest Reserves were created that the Indian people were
> > told that these lands could no longer be used by them
> > without restrictions."
>
> We used similar language in describing the same type of situation in
> *Pueblo of Nambe v. United States*, 16 Ind. Cl. Comm. 393, 420.
>
> We found in the above cases that the creation of forest reserves had
> caused these Pueblo Indians to be squeezed out of their ancestral
> lands and constituted a taking of these lands.

*Id.* at 74. This and other conduct of the government sufficiently interfered with

the pueblos' traditional ways of living so as to effect a taking of their aboriginal

titles to the land involved in the *Zia* litigation.

At this point in the current proceedings, neither party has had the

opportunity to offer evidence about whether anyone has actually interfered with

the Jemez Pueblo's traditional occupancy and uses of the land in question here,

before or after 1946. In sum, on the present record, we cannot say that either the

Baca grant or use of the land by the Baca heirs or their successors establish as a

---

[19] The "documents" referred to were government documents received in evidence. *See Pueblo of Taos*, 15 Ind. Cl. Comm. at 702.

matter of law that the Jemez Pueblo had a pre-1946 claim against the government under the ICCA.

### c. *Navajo*

The government also asserts that the Jemez Pueblo's claim is foreclosed by our decision in *Navajo*, 809 F.2d 1455, arguing that the case is directly on point and that it rejected similar arguments now made by the Jemez Pueblo. But *Navajo* is distinguishable. There, the Tribe brought a quiet title action against the United States to affirm its title to unalloted lands within an Executive Order Reservation that were restored to the public domain before all congressionally mandated allotments were made to the Navajos living on the reservation. *Id.* at 1457. The Tribe had initially ceded the land at issue to the United States by Treaty in 1868, *id.* at 1461-62, and in 1907 the President's Executive Order 709, as amended by Executive Order 744, added 1.9 million acres to the Navajo Indian Reservation, *id.* at 1457. "The President intended that a temporary reservation of the lands be made until such time as the Indian occupants could be allotted." *Id.* at 1457-58 (internal quotation marks omitted).

Congress then passed the Act of May 29, 1908, ch. 216, § 25, 35 Stat. 444, 457, which provided that when the President "is satisfied that all the Indians in any part of the Navajo Indian Reservation in New Mexico and Arizona created by" Executive Orders 709 and 744 "have been allotted, the surplus lands in such part of the reservation shall be restored to the public domain and opened to settlement

-49-

and entry by proclamation of the President." *Navajo*, 809 F.2d at 1459.  Following this act of Congress, the President issued Executive Order 1000, which restored to the public domain "unalloted lands within certain sections of the reservation created by Executive Order Number 709, as amended by 744, except for 110 unapproved allotments." *Id.*  In 1911, President Taft issued Executive Order 1284, "restoring to the public domain additional surplus lands in that reservation." *Id.* Subsequently, but before 1946, the government "issued patents on parts of such land to the State of New Mexico as well as to the predecessors in interest of the defendant landowners in this case." *Id.*

We recognized in *Navajo* that in *Solem v. Bartlett*, 465 U.S. 463, 475-76 (1984), the Court "held that, standing alone, the phrase restored to 'the public domain' does not evince explicit congressional intent to disestablish or diminish an Indian reservation." *Navajo*, 809 F.3d at 1459 n.7.  But we noted the Navajo had nevertheless conceded with respect to the land at issue that the phrase "restored to the public domain," in both "Executive Orders 1000 and 1284 was intended to disestablish the addition to the Navajo Reservation created by Executive Order 709, as amended by Executive Order 744." *Id.*  We explained that "[i]nstead, the Tribe argues that, notwithstanding Congress' intent to diminish, the President's orders were null and void as inconsistent with congressionally mandated prerequisites for such diminishment." *Id.*

The essence of the Navajo's claim was that "the Executive Orders were null

-50-

and void, because they violated the prerequisite established by section 25 of the Act of May 29, 1908, for returning the unallotted lands to the public domain – that all Navajos first be granted an allotment." *Id.* at 1462. The Tribe based its argument on the fact that at the time the last two Executive Orders were issued, "less than one-half of the eligible Navajos then living on the reservation had received allotments." *Id.* at 1459. The Navajo's central argument was "that the United States breached its fiduciary duty to the Tribe by restoring such lands to the public domain in Executive Orders Number 1000 and 1284." *Id.* at 1462. Accordingly, the Tribe claimed, its title was never effectively extinguished. *Id.* at 1463.

We held that the Tribe's claims "accrued in 1908 and 1911 when Executive Orders Number 1000 and 1284 were issued, respectively, or at least when the Tribe learned of the President's actions." *Id.* at 1470. We explained that the Navajo "simply cannot pretend that the issuance of both the Executive Orders and [subsequent] land patents never occurred" prior to 1946. *Id.* at 1471. We held that "[t]he Tribe's claim was one arising under Executive Orders of the President under section 2 of the ICCA and therefore one within the jurisdiction of the Commission, since both alleged receipt of title to the subject lands and the Government's action inconsistent with that title arose pursuant to Executive Orders." *Id.* Accordingly, we concluded that "[b]ecause these claims clearly accrued before 1946, the Tribe had until 1951 to assert them before the

-51-

Commission, where it would have been limited to monetary recovery if its claims were found valid." *Id.*

The claim in *Navajo* is significantly different from the claim here in two important respects. First, it was a claim of title granted by Presidential Executive Order, which is different than a claim based on aboriginal title. At the time of the grant, the President had no power to convey anything other than transitory, possessory rights to tribes in Executive Order Reservations. *Confederated Bands of Ute Indians v. United* States, 330 U.S. 169, 176-81 (1947) (Executive Order created nothing more "than a mere temporary and cancellable possessory right to the Indians"); *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 327-28 (1942). We emphasized in *Navajo* this temporary nature of the title granted. *See* 809 F.2d at 1457-58 ("The President intended 'that a temporary reservation of the lands be made until such time as the Indian occupants could be allotted.'") (quoting Letter from Mr. C.F. Larrabee, Acting Commissioner of Indian Affairs, to the Honorable J.S. Sherman, Chairman, House Committee on Indian Affairs)). The interest of the Tribe in *Navajo*, therefore, was very different than a claim based on aboriginal possession. Second, the Navajo actually conceded that the last two Executive Orders were intended to extinguish its aboriginal title. The Jemez Pueblo contends, to the contrary, that its aboriginal title was never extinguished by Congress, and the government has not established otherwise.

Finally, in *Navajo* it was clear from the final Executive Order in 1911 that

the President intended to extinguish the Tribe's claim to the reservation land. This is especially important, because "prior to the enactment of the" ICCA in 1946, Indians were not entitled to compensation "when the President by Executive order subsequently took land, previously set aside by Executive Order as a reservation for the benefit of the Indians, and returned said land to the public domain without any payment of compensation to the Indians." *Northern Paiute Nation v. United States*, 634 F.2d 594, 601 (Ct. Cl. 1980) (citing *Ute Indians*, 330 U.S. at 176; *Sioux Tribe*, 316 U.S. at 331). Once the ICCA in 1946 authorized compensation for claims based on Presidential Executive Orders, however, it would have become clear to the Navajo that it now had a compensatory claim based on the 1911 taking of its land by Executive Order.

In our case, on the other hand, the Baca grant did not extinguish aboriginal title as a matter of law. Our decision in *Navajo* does not trump the Supreme Court cases holding aboriginal title cannot be extinguished by the grant to a third party of fee title to the land at issue except by clear and unambiguous congressional intent. *See, e.g.*, *Santa Fe*, 314 U.S. at 346, 354 (congressional intent to extinguish aboriginal title must be "plain and unambiguous" and will not be "lightly implied"); *see also Johnson v. M'Intosh*, 21 U.S. 543 (1823); *Mitchel*, 34 U.S. 711 (1835); *Chouteau*, 57 U.S. 203 (1853); *Holden v. Joy*, 84 U.S. 211 (1872); *Buttz*, 119 U.S. 55 (1886); *Cramer*, 261 U.S. 219 (1923); *Shoshone Tribe*, 304 U.S. 111 (1938); *Oneida Indian Nation*, 414 U.S. 661 (1974).

In sum, we hold that the 1860 grant by the United States of Baca Location No. 1 did not by itself extinguish aboriginal title of the Jemez Pueblo such that the Pueblo was required to bring a claim against the United States when Congress enacted the ICCA in 1946.

### 2. ICCA § 22

Section 22(a) of the ICCA states in pertinent part: "The payment of any claim, after its determination in accordance with this Act, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." The government points out that in *Zia I*, 11 Ind. Cl. Comm. 131, the Jemez Pueblo alleged aboriginal title to 520,000 acres of land, and was eventually paid for a taking in *United States v. Pueblo De Zia*, 474 F.2d 639 (Ct. Cl. 1973) (*Zia IV*). The government argues that § 22 bars the Jemez Pueblo's claim because the compensation it received in the *Zia* litigation was for lands that "touched upon" the lands that are the subject of the claim here. Aple. Br. at 42.

The Jemez Pueblo responds that the lands at issue in the prior litigation concerned different lands and, unlike here, the pueblos conceded in the *Zia* litigation that their aboriginal title to the land had been extinguished over time by congressional authorization before 1946, so the ICCA provided them a claim for the taking of that land. Specifically, § 2 of the ICCA provided in relevant part that the ICC had jurisdiction to hear "claims arising from the taking by the United

States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant." ICCA § 2, 25 U.S.C. § 70a(4) (1976); *see also Arizona v. California*, 530 U.S. 392, 402-03 n.1 (2000) ("The Act conferred exclusive jurisdiction on the Commission to resolve Indian claims solely by payment of compensation." (emphasis added)); *United States v. Dann*, 873 F.2d 1189, 1198 (9th Cir. 1989) (The ICC "simply had jurisdiction to award damages for takings or other wrongs that occurred on or before August 13, 1946").

Given our conclusions that the Baca grant did not extinguish aboriginal title of the Jemez Pueblo and that there is no evidence the Pueblo had a claim against the United States prior to 1946 with respect to the land involved in this action, we disagree with the government that the Jemez Pueblo could have brought its current claims before the ICC in the prior litigation. The government's res judicata argument fails because the Jemez Pueblo's current claim is a quiet title action to establish that its aboriginal title to different land has not been extinguished.[20]

---

[20] The government cites numerous cases in support of its argument that § 22 of the ICCA bars the Jemez Pueblo's claim under a res judicata theory. But the cases it cites are factually inapplicable and do not support its argument. The government also argues that "under typical claim preclusion, [the] Jemez Pueblo's claims would be barred" because the "parties are identical, the ICC and Court of Claims issued a final judgment on the merits of [the] Jemez Pueblo's aboriginal title and its extinguishment, and under the transactional test this claim is identical to the prior action." Aple Br. at 45 (citing *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1148-54 (10th Cir. 2006)). But the Jemez Pueblo's current claim on

(continued...)

**B. Motion to dismiss under Rule 12(b)(6)**

The government argues in the alternative that even if the district court erred in granting its motion to dismiss for lack of jurisdiction, we should nevertheless affirm dismissal of the action for failure to state a claim under Fed. R. Civ. P. 12(b)(6). It contends the Jemez Pueblo did not allege facts in its Complaint showing that it maintained "full dominion and control over the area, such that it possessed the right to expel intruders, as well as the power to do so." Aple. Br. at 47 (internal quotation marks omitted). Essentially, the government is contending the Complaint fails to allege sufficient facts to establish aboriginal title.

As we noted earlier, "we accept as true all well-pleaded factual allegations" in the Complaint and view them "in the light most favorable to the [Jemez Pueblo]." *Casanova*, 595 F.3d at 1124-25. A pleading is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[20](...continued)
appeal is not a pre-1946 takings claim and involves different land. It is therefore not identical to the prior action before the ICC.

In *Khalik v. United Air Lines*, we observed under *Twombly* and *Iqbal* that "[a] plaintiff must 'nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss.'" 671 F.3d 1188, 1190 (10th Cir. 2012) (alteration in original) (quoting *Twombly*, 550 U.S. at 570). The complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. We recognized in *Khalik*, 671 F.3d at 1191, that "[t]here is disagreement as to whether this new standard requires minimal change or whether it in fact requires a significant heightened fact-pleading standard." We held:

> [T]he *Twombly/Iqbal* standard is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or formulaic recitation of the elements of a cause of action, which the Court stated will not do. In other words, Rule 8(a)(2) still lives. . . . [U]nder Rule 8, specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the ground upon which it rests.

*Id.* at 1191-92 (internal quotation marks and alterations in original omitted).

In each case, "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," *Kan. Penn. Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011), and this "context specific task . . . requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679. "[T]he 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint," but rather requires only that the Plaintiff

-57-

allege enough factual allegations in the complaint to "set forth a plausible claim." *See Khalik*, 671 F.3d at 1192.

The Jemez Pueblo has alleged sufficient facts in its Complaint to survive the 12(b)(6) standard. It alleges that it has used and occupied the Valles Caldera for the last 800 years and provides sufficient detail to put the government on notice of its claim of aboriginal title. The government asserts that the Complaint fails to state a claim because it "is devoid of any factual allegations suggesting that the Jemez Pueblo had or exercised the right to expel the Baca heirs or their successors-in-interest or that the Pueblo exercise[d] full dominion and control over the Baca Ranch." Aple. Br. at 48 (internal quotation marks omitted). This argument fails because, as stated *supra* at 42, simultaneous use and occupancy of the land pursuant to fee title and aboriginal title could occur since the nature of aboriginal occupancy differed significantly from the occupancy of settlers. Accordingly, the Jemez Pueblo did not have to allege that the Baca heirs and their successors were not using the land so long as the Pueblo alleged that it was also using the land in traditional Indian ways.

Finally, the government contends that "as a matter of law, Congress' passage of the Preservation Act to govern the National Preserve would have extinguished aboriginal title, if any such right still existed." Aple. Br. at 48. However, nowhere in the Preservation Act did Congress say it intended to extinguish aboriginal title. Rather, as the Jemez Pueblo and Amici point out, one

of the purposes of the Act was to preserve the cultural and historic value of the land, 16 U.S.C. § 698v-3(b), while avoiding interference with "Native American religious and cultural sites," *id.* § 698v-3(g)(2)(B).  While there were other purposes as well, the management of the Preserve for all of its purposes is to be done in consultation with Indian tribes and pueblos.  *Id.* § 698v-6(f)(5).  Moreover, the warranty deed the government accepted from the Baca successors to create the Preserve specifically excepted from the warrants all prior "claims of and demands of any Indian nation, tribe, or pueblo."  *See supra* at 42 n.17.  Accordingly, we are not persuaded the government is entitled to dismissal of the Jemez Pueblo's claim based on its contention that Congress' creation of the Preserve extinguished the Pueblo's aboriginal title as a matter of law.[21]

---

[21] The government submitted supplemental authority showing that Congress recently enacted the National Defense Authorization Act of 2015, Pub. L. No. 113-291, H.R. 3979, 113th Cong. and declared in section 3043 that "the Valles Caldera National Preserve is designated as a unit of the National Park System."  It also transferred administrative jurisdiction over the Preserve to the Department of the Interior.  Aple. Supplemental Authority Pursuant to Fed. R. App. P. 28(j).  As a consequence, it argues, "[b]y designating the lands at issue in this case as a unit of the National Park System, Congress undisputedly extinguished any unrecognized aboriginal title."  *Id.*  In response, the Jemez Pueblo points to § 3043(b)(13)(C)(13) which specifically states that "[n]othing in this section affects valid existing rights."  Aplt. 28(j) Resp.  We leave it to the district court to address this new authority in the first instance on remand.

# V

## CONCLUSION

We REVERSE the district court's dismissal of the action and REMAND for further proceedings consistent with this opinion.